Lula Mae CONNER and Hattie Massie, on behalf of themselves individually and on behalf of all others similarly situated, Plaintiffs,

v.

Robert FINCH, Secretary, United States Department of Health, Education and Welfare, Harold O. Swank, Director, Illinois Department of Public Aid, David L. Daniels, Director, Cook County Department of Public Aid, Defendants.

Nos. 69–C–1264, 69–C–1276.

United States District Court, N. D. Illinois, E. D.

June 11, 1970.

Michael F. Lefkow, Chicago, Ill., for plaintiff Conner.

John H. Schlegel, Chicago, Ill., for plaintiff Massie.

Thomas A. Foran, U. S. Atty., Lawrence Cohen, Chicago, Ill., David J. Anderson, Washington, D. C., for defendant Finch.

William J. Scott, Atty. Gen., State of Ill., John F. Galvin, Asst. Atty. Gen., Chicago, Ill., for State of Ill.

Edward V. Hanrahan, State's Atty., Daniel P. Coman, Asst. State's Atty., Chief, Civil Div., Francis Barth and Thomas E. Brannigan, Asst. State's Attys., Chicago, Ill., for defendant Daniels.

Before FAIRCHILD, Circuit Judge, ROBSON, Chief District Judge and CAMPBELL, Senior District Judge.

## MEMORANDUM, ORDER AND JUDGMENT

CAMPBELL, District Judge.

These consolidated cases brought under the Civil Rights Act (42 U.S.C. § 1983), challenge the constitutionality of a section, or portion thereof, of the Social Security Act ("the Act") and of a rule of the Illinois Department of Public Aid promulgated pursuant to the challenged sub-section of the Act.[1] The sub-section in question (42 U.S.C. § 602 (a) (8) (D) of the Act) and the rule (68.54) relate to conditions for eligibility for certain assistance under the program of Aid to Families with Dependent Children ("AFDC"). Under the Act and the AFDC program, the basic needs of an applicant are determined by local officials pursuant to a state plan. These needs, or a portion thereof, are then met by an assistance grant. Before determining whether an applicant is in need of assistance the state agency must take into consideration any other income and resources of the applicant (42 U.S.C. § 602(a) (7)), except as specified. 42 U.S.C. § 602(a) (8). One such specified exception is the subject of this litigation.

Under the 1967 amendments the state or local agency, in determining the needs and the income of any persons, shall disregard a portion of his income (the first $30.00 of the total of such earned income for such month plus one-third of the remainder of income for the month). The income exclusion or "disregard" provisions do not apply, however, if the income of any person for any month was in excess of their need as determined by the state agency, *"unless, for any one of the four months preceding such month, the needs of such persons were met by the furnishing of aid under the plan."* 42 U.S.C. § 602 (a) (8) (D).

Plaintiffs allege that the *under scored* sub-section (D) which limits eligibility for the income exclusion benefits of those whose income exceeds their needs to those who received aid in one of the preceding four months and denies the benefit of the income exclusion provision to those who have not received such aid within one of the past four months is unconstitutionally discriminatory, in violation of Equal Protection Clause of the Fourteenth Amendment and the Due Process Clause of the Fifth Amendment to the United States Constitution.[2] The operation of the income exclusion provisions and the potential discrimination in their application and of which plaintiffs complain is perhaps best illustrated by stating the actual facts of one of these cases.

Plaintiff Hattie Massie is employed. Until May, 1968 she received a modest grant under the AFDC program. At that time her grant was cancelled when her needs dropped below her income. In June of 1968 the income exclusion regulation went into effect in Illinois and would have applied to Mrs. Massie's situation had she applied for the benefits of the new provision, because at that time the needs of Mrs. Massie and her

---

1. Though purporting to be a class action pursuant to Rule 23 (Fed.R.Civ.Proc.) no motion has been presented for a determination as to whether it may be so maintained (Rule 23(c)), and we now find it unnecessary to make such a determination.

2. Generally, the contentions as to the denial of Equal Protection apply to the state defendants. The Due Process argument applies to the federal defendant. See Shapiro v. Thompson, 394 U.S. 618, 641–642, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

five children were determined by the Illinois Department of Public Aid to be $329.00 per month while her estimated income was $397.00. Under the federal statute and state regulation, and by way of further illustration of the application, Mrs. Massie would have been entitled to deduct the statutory formula ($30.00 plus one-third of the remainder of the monthly income, i. e., one-third of $367.00) from her income in determining whether that income met her monthly needs. Under that formula her income would have been estimated to be approximately $232.00 ($397.00 less $30 plus one-third of $367.00). Accordingly, Mrs. Massie would have been entitled to a supplemental grant of approximately $86.00 per month to meet monthly needs of $329.00. Unfortunately she was unaware of the benefits of the 1967 Amendments, herein described, and never applied when she was eligible, i. e., at that time when within one of the past four months she received assistance under the AFDC program. Since she has not received assistance in any of the past four months she is no longer eligible for the income exclusion benefits. Other persons identically situated in terms of income and needs, but who have received assistance in one of the past four months, are eligible and do receive the benefits of the income exclusion provisions.

These and other essential facts of these cases are not in dispute. Both plaintiffs have moved for summary judgment declaring the statute and state regulations unconstitutional and for an issuance of an injunction enjoining their further application and enforcement. Plaintiffs also seek compensatory and other damages for the loss of benefits under the statute.

Defendants, the Secretary of Health, Education and Welfare and the Illinois and Cook County Directors of Public Aid,[3] have filed motions to dismiss for various reasons including the contention that the complaints fail to state a claim upon which relief can be granted.

■ Because this action sought an injunction restraining the enforcement of an Act of Congress and a regulation of the State of Illinois adopted pursuant thereto, a three Judge Court was empaneled pursuant to 28 U.S.C. § 2284. Extensive briefs were filed and the court heard oral argument on behalf of all parties directed to all issues presented by the motions for summary judgment and motions to dismiss. We conclude first that we have jurisdiction over the subject matter and the persons of the various defendants, and that plaintiffs have standing to pursue this cause. We now consider the merits.

■ It is unnecessary to relate the history of this social welfare legislation in detail. The AFDC program originated with the Social Security Act of 1935. It is a program financed jointly by the federal government and the state. Each state computes the "standard of need" of each family unit within its borders. See Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) and Rosado v. Wyman 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). The variances in the various state programs are described in the *Dandridge* opinion:

> "Some States provide that every family shall receive grants sufficient to meet fully the determined standard of need. Other States provide that each family unit shall receive a percentage of the determined need. Still others provide grants to most families in full accord with the ascertained standard of need, but impose an upper limit on the total amount of money any one family unit may receive." (397 U.S. at 473, 90 S.Ct. at 1155).

In *Dandridge*, the Court considered a challenge under the Equal Protection Clause to a "maximum grant regulation" adopted by the State of Maryland. Un-

---

3. In the second *Conner* case, consolidated herein, a Public Aid caseworker and supervisor were also named. We find their participation neither necessary nor appropriate.

der the Maryland system, the state computes a standard of need for each eligible family based on the circumstances of the family, particularly the number of children. In general, the standard of need increases with each additional person in the household, but the increase becomes proportionately smaller. The regulation in *Dandridge* concerned a state imposed upper limit or "maximum grant" for any one family. The plaintiffs in that case were large families whose statutorily computed needs exceeded the upper limits or maximum grants available. They thus argued that the maximum grant limitation operates to discriminate against them merely because of the size of their families. The three-judge district court agreed and found the statute unconstitutional, Williams v. Dandridge, 297 F. Supp. 450 (D.Md., 1969). That decision was cited and relied on by plaintiffs in this case. Subsequent to the arguments in this case, however, the Supreme Court reversed the decision of the three-judge district court.

In our present analysis of the constitutional validity of the statute before us and the congressional purpose giving rise to its enactment, we are of course guided and bound by the rationale and holding of the Supreme Court in Dandridge v. Williams.

The purpose of Congress in adopting the income exclusion provisions and the exception here in dispute is clear from the legislative history.

"(c) Incentives for employment

"Disregarding some earned income. —A key element in any program for work and training for assistance recipients is an incentive for people to take employment. If all the earnings of a needy person are deducted from his assistance payment, he has no gain for his effort. Currently, there is no provision in the Social Security Act under which States may permit an employed parent or other relative under the AFDC program to retain some of his earnings. There

is no doubt, in the opinion of the committee, that the number of recipients who seek and obtain employment will be greatly increased if, in conjunction with the work incentive program, there may be added to title IV some specific earnings incentives for adults to work. The Department of Health, Education and Welfare has informed the committee that research and demonstration projects have illustrated that more recipients will go to work when an incentive exists.

\* \* \* \* \* \*

"The earnings exemption provisions will apply to the AFDC program only if for any one of the past 4 months the family was eligible for a payment. This provision gives people an opportunity to try employment without worrying about forfeiting their eligibility to receive assistance if their employment terminates quickly.

"The bill contains provisions which will prevent increasing the number of persons receiving AFDC as a result of the earnings exemptions. The provisions discussed above are to become available for AFDC only with respect to persons whose income was not in excess of their needs as determined by the State agency without the application of this provision itself. That is, only if a family's total income falls below the standard of need will the earnings exemption be available. One possible result of this provision is that one family who started out below assistance levels, will have some grant payable at certain earnings levels because of the exemption of earnings received after going on the rolls while another family which already had the same earnings will not be eligible for an assistance grant. The committee appreciates the objections to this type of situation which can be made; but the alternative would have increased the costs of the proposal by about $160 million a year by placing people on the AFDC rolls who now have earnings in excess of their need for public assistance as determined

under their State plan. In short, the various provisions included in the committee's bill are designed to get people off AFDC rolls, not put them on." (1967, U.S. Code Cong. & Adm. News, pp. 2994–2996).

 Plaintiffs contend, that as laudable as this congressional intent may be, its inherent inequities as illustrated by the circumstances of plaintiff Massie set forth above, cause the provision to be irreconcilable with the Due Process Clause of the Fifth Amendment and the Equal Protection Clause of the Fourteenth Amendment.[4] The constitutionality of the state regulation must of course be measured by the Equal Protection Clause of the Fourteenth Amendment. If the state regulation fails the test, the federal statute must necessarily fall along with it, as Congress may not authorize the state to violate the Equal Protection Clause. Shapiro v. Thompson 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). Furthermore, the Due Process Clause imposes upon the federal government a somewhat similar standard as applied to the states under the Equal Protection Clause. Shapiro v. Thompson 394 U.S. at 641–642, 89 S.Ct. 1322.

Should we agree with the constitutional contentions of plaintiffs, we are asked to enjoin the Secretary of Health, Education and Welfare and the state and local defendants from enforcing subsection D of section 602(a) (8), which contains the four month condition so that the earned income exemption of § 602(a) will apply to every one across the board. In effect, plaintiffs are arguing that the present "needs standard" of this state are too low and that families with very low incomes not receiving the additional benefits of the "income exclusion provisions" cannot meet their basic needs under the present standard. We are thus asked to judicially decree a higher standard of need for this state. Defendants urge, in opposition to plaintiffs' position, that we may not order additional benefits for plaintiffs and others similarly situated but that upon a finding of unconstitutional discrimination, we may only prohibit others from enjoying the "exclusion" benefits.

In weighing this difficult constitutional question we must first observe that there is considerable merit in much of what plaintiffs and their counsel have to say. While the Secretary of Health, Education and Welfare argues that the congressional enactment serves the commendable purpose of allowing recipients to try employment without fear of losing their eligibility to again receive assistance if their employment terminates quickly, we think that their return to the assistance rolls can be assured in other ways. The Secretary's further argument that the purpose is to offer recipients some additional incentive to give "work a chance", may also have the effect of discouraging those who had given "work a chance" and who are now penalized for doing so, as they cannot meet the four month condition precedent here challenged. These persons may be encouraged to quit work, obtain public assistance, and then later return to work with the additional benefits of the income exclusion provision, which they would have then *earned* by their brief tenure on the assistance rolls.

We also see considerable social merit in what may be said to be the ultimate objective of plaintiffs and their counsel —a decree which would in effect increase this state's standard of need. By such a decree we would judicially establish, for a significant portion of the population, a guaranteed income such as has been urged by the present administration and which was recommended by *The Report of The President's Commission On Income Maintenance Program*, "Poverty

---

4. Plaintiffs also contend that the limited income exclusion provision violates the Ninth and Tenth Amendments in that it deprives plaintiffs of a right to "family life", because these families receive less in assistance than others. We find no substantial constitutional question presented by these arguments.

Amid Plenty, The American Paradox." Relevant to the issues here, the Report of the President's Commission stated (at page 5):

> "The lack of a program which aids working men and women not only creates economic disincentives and encourages family breakup, it is also socially divisive, because it is possible for incomes of some aid recipients to exceed the incomes of low earners".

■ As much as we may agree with the objective of plaintiffs and their counsel, and as much as we might like to prod the present administration and the Congress, by force of our judicial decree, our analysis of the problem may not be in terms of what we believe to be the most desirable social policy for this state and our nation.

Rather, as pointed out by the Court in Dandridge v. Williams, supra at 397 U.S. 471, 90 S.Ct. 1153, our review is limited to a determination of whether the provisions here under attack, and the distinctions found therein have some reasonable basis.

In *Dandridge,* the Court in first determining that the Maryland statute did not conflict with the directives of the Social Security Act, discussed the difficult judgments which face every state and Congress when they consider how best to allocate funds available for public assistance.

> "Given Maryland's finite resources, its choice is either to support some families adequately and others less adequately, or not to give sufficient support to any family. We see nothing in the federal statute that forbids a State to balance the stresses which uniform insufficiency of payments would impose on all families against the greater ability of large families— because of the inherent economies of

scale—to accommodate their needs to diminished per capita payments." (397 U.S. at 479, 90 S.Ct. at 1159).

In holding that the decision of the State of Maryland to impose a "maximum grant limitation" (discussed *supra*) was within the legitimate interests of the state, the Court observed, in terms germane to our discussion here, that, "the Fourteenth Amendment gives the federal courts no power to impose upon the States their views of wise economic or social policy" (397 U.S. at 486, 90 S.Ct. at 1162).[5]

The Court then discussed the many variables at play in the maximum grant regulation, the many resulting inequities, yet concluded that acceptable legislative purposes of the regulation, provided an adequate and justifiable rationale basis, thus placing the regulation beyond the reach of federal judicial power.

> "In the area of economics and *social welfare,* a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369. "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730. "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393.

---

5. See, also, Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970) wherein the Court stated: "It is, of course, no part of the business of this Court to evaluate, apart from federal constitutional or statu-

tory challenge, the merits or wisdom of any welfare programs, whether state or federal, in the large or in the particular." (397 U.S. at 422, 90 S.Ct. p. 1223)

\* \* \* \* \* \*

"We need not explore all the reasons that the State advances in justification of the regulation. It is enough that a solid foundation for the regulation can be found in the State's legitimate interest in encouraging employment and in avoiding discrimination between welfare families and the families of the working poor. By combining a limit on the recipient's grant with permission to retain money earned, without reduction in the amount of the grant, Maryland provides an incentive to seek gainful employment. And by keying the maximum family AFDC grants to the minimum wage a steadily employed head of a household receives, the State maintains some semblance of an equitable balance between families on welfare and those supported by an employed breadwinner.

"It is true that in some AFDC families there may be no person who is employable. It is also true that with respect to AFDC families whose determined standard of need is below the regulatory maximum, and who therefore receive grants equal to the determined standard, the employment incentive is absent. But the Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369. It is enough that the State's action be rationally based and free from invidious discrimination. The regulation before us meets that test.

We do not decide today that the Maryland regulation is wise, that it best fulfills the relevant social and economic objectives that Maryland might ideally espouse, or that a more just and humane system could not be devised. Conflicting claims of morality and intelligence are raised by opponents and proponents of almost every measure, certainly including the one before us. But the intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court. The Constitution may impose certain procedural safeguards upon systems of welfare administration, Goldberg v. Kelly, [ante]. But the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." (397 U.S. at 485, 90 S.Ct. at 1161–1163)

It is obvious from our discussion of *Dandridge* that its rationale is controlling here. The congressional enactment and the state regulation, though not free of inequities and inconsistencies, are supported by acceptable and what even plaintiffs agree to be laudable legislative objectives. As defendants have explained, the thrust of the AFDC changes in the Social Security Amendments of 1967, was to attempt to make more families self sufficient. The income exclusion provisions were considered as potentially an attractive incentive toward employment. By accepting employment, the federal and state governments save two-thirds of their former payments.

While it is also obvious from our opinions expressed herein that we may not agree that the "income exclusion provisions" of the Social Security Act, particularly as applied to plaintiffs, are either completely wise or best fulfill the social and economic objectives of the AFDC program, still we find these provisions based on a solid legislative foundation and beyond the reach of our "more enlightened" judicial second guess as to how the difficult responsibility of allocating limited public welfare funds should be handled.

For these reasons, we conclude that the statutory provisions here sought to be declared unconstitutional and their enforcement enjoined, are constitutionally valid and enforceable.

Accordingly, the motions of plaintiffs for summary judgment are denied and the motions of defendants to dismiss are granted and these causes are ordered dismissed.

Judgment accordingly.