[S.F. No. 22820. In Bank. Sept. 21, 1971.]

COUNTY OF ALAMEDA et al., Plaintiffs and Respondents, v. ROBERT B. CARLESON, as Director, etc., Defendant and Respondent; CALIFORNIA WELFARE RIGHTS ORGANIZATION et al., Movants and Appellants.

[Sac. No. 7898. In Bank. Sept. 21, 1971.]

MARY HAVENS et al., Plaintiffs and Respondents, v. ROBERT B. CARLESON, as Director, etc., Defendant and Appellant.

[S.F. No. 22816. In Bank. Sept. 21, 1971.]

COUNTY OF ALAMEDA et al., Petitioners, v. THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent; ROBERT B. CARLESON, as Director, etc., et al., Real Parties in Interest.

[S.F. No. 22817. In Bank. Sept. 21, 1971.]

CALIFORNIA WELFARE RIGHTS ORGANIZATION et al., Petitioners, v. THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent; ROBERT B. CARLESON, as Director, etc., et al., Real Parties in Interest.

## COUNSEL

Clifford Sweet, William R. Petrocelli, Lawrence A. Baskin, Denis Clifford and F. Hayden Curry for Movants and Appellants in No. 22820, Plaintiffs and Respondents in No. 7898, Real Parties in Interest Association et al. in No. 22816 and Petitioners in 22817.

Evelle J. Younger, Attorney General, and Jay S. Linderman, Deputy Attorney General, for Defendant and Appellant in No. 7898, for Defendant and Respondent in No. 22820 and Real Party in Interest Director of Social Welfare in Nos. 22816 and 22817.

Richard J. Moore, County Counsel (Alameda), Kelvin H. Booty, Jr., Deputy County Counsel, Daniel V. Blackstock, County Counsel (Butte), Douglas J. Maloney, County Counsel (Marin), Robert G. Berrey, County Counsel (San Diego), Keith C. Sorenson, District Attorney (San Mateo), William M. Siegel, County Counsel (Santa Clara), and Calvin E. Baldwin, County Counsel (Tulare), for Plaintiffs and Respondents in No. 22820, Petitioners in No. 22816 and Real Parties in Interest Counties in No. 22817.

No appearance for Respondent in Nos. 22816 and 22817.

## OPINION

**BURKE, J.**—These consolidated cases involve questions of interpretation of certain provisions of the Social Security Act (42 U.S.C. § 602, subd, (a)), which set forth the requisites for a state plan for aid and services to needy families with children (AFDC program). At issue is the important question whether California's plan, as set forth in the Welfare and Institutions Code and implemented by regulations promulgated by the California Department of Social Welfare, conforms to the provisions of the federal Act.[1]

In S.F. 22820 (hereafter "the Alameda action") plaintiff counties brought an action in February 1971 for declaratory and injunctive relief in Alameda County against defendant Carleson, Director of the Department of Social Welfare, contending that certain departmental regulations pertaining to eligibility for AFDC grants were invalid as interpreted and applied by Carleson. Since the effect of a judgment in counties' favor would be

---

[1]For additional background information regarding the AFDC program, see *California Welfare Rights Organization* v. *Carleson,* 4 Cal.3d 445 [93 Cal.Rptr. 758, 482 P.2d 670], involving a similar conformity problem.

to terminate AFDC grants to certain welfare recipients, California Welfare Rights Organization[2] and three individual welfare recipients (hereafter collectively referred to as "CWRO") sought to intervene as parties in the action, alleging that they had a direct pecuniary interest in the amount of AFDC grants, which interest would be directly affected by the result of counties' suit. ■■■ The trial court denied intervention but permitted CWRO to appear as amicus curiae. CWRO, on March 25, noticed an appeal from the order denying intervention. Subsequently, on April 9, the trial court entered its judgment declaring certain of Carleson's regulations invalid; on April 13, the court issued a peremptory writ of mandate ordering him to amend, or alter his interpretation of those regulations along the lines requested by counties. CWRO filed a motion to vacate the judgment and renewed its application to intervene, but both motions were denied.[3] Thereupon, on May 7, CWRO noticed an appeal from the entire proceedings in the case; defendant Carleson, however, has not appealed therefrom. We tranferred CWRO's appeal to this court and, on June 14, stayed further enforcement of the judgment pending our disposition of the appeal.

Pursuant to the judgment and writ of mandate in the Alameda action, Carleson had, on April 29, adopted an emergency regulation to become effective June 1, which would have the effect of terminating AFDC grants to certain recipients. In an attempt to enjoin Carleson from carrying that regulation into effect, CWRO (and three different welfare recipients) on May 17, initiated an action (Sac. 7898, hereafter "the Sacramento action"), against Carleson in Sacramento County, seeking injunctive and other extraordinary relief. The trial court on May 25 issued a temporary restraining order enjoining Carleson from "instituting" the emergency regulation, and an alternative writ of mandate compelling Carleson to rescind that regulation or to show cause on June 10 why such relief should not be granted. On June 1, Carleson noticed his appeal from the temporary restraining order. We transferred that appeal to this court and, on June 14, stayed the operation of that order pending appeal. Thereafter, on June 23, we stayed further enforcement of Carleson's emergency regulation pending our determination of the proceedings.

In S.F. 22816, counties (plaintiffs in the Alameda action) sought prohibition to restrain further proceedings in the Sacramento action, alleging that the court was without jurisdiction to proceed further in that action. We transferred the matter to this court and issued an alternative writ of prohibition to the Sacramento court.

---

[2]CWRO is an unincorporated association alleging that it "initiates litigation on behalf of its members and all welfare recipients in the State of California."

[3]The trial court purported to "strike" the motion to vacate, rather than simply deny it, for reasons discussed below.

Finally, in S.F. 22817, CWRO, on June 2, filed an original action in this court seeking supesedeas, prohibition and mandate to stay enforcement of the Alameda judgment, to enjoin Carleson from implementing the emergency regulation referred to above, to prohibit further enforcement of the Alameda judgment, and to compel Carleson to rescind the emergency regulation. As noted above, certain of the relief requested already has been granted by this court.

## 1. *Procedural Matters*

We have consolidated the foregoing cases so that this court might decide the important substantive issues common to each of them. Since the Alameda action proceeded to trial and judgment, and since the other actions now before us were filed either directly or indirectly in response to that judgment, the appeal therefrom provides the most appropriate vehicle for review of those issues, and our determination of that appeal would render moot the three remaining actions.

As indicated above, however, defendant Carleson chose not to appeal from the judgment obtained by counties in the Alameda action. Thus, the question arises whether CWRO, denied the status of intervener, had standing to appeal from that judgment. We have concluded that CWRO, by moving to vacate the judgment, made itself a party to the Alameda action for purposes of taking an appeal.

"Any aggrieved party" may appeal from an adverse judgment. (Code Civ. Proc., § 902.) ■ It is generally held, however, that only parties of record may appeal; consequently one who is denied the right to intervene in an action ordinarily may not appeal from a judgment subsequently entered in the case. (*Braun* v. *Brown,* 13 Cal.2d 130, 133-134 [87 P.2d 1009]; *In re Veterans' Industries, Inc.,* 8 Cal.App.3d 902, 916 [88 Cal. Rptr. 303].) Instead, he may appeal from the order denying intervention. (*Id.*)[4] ■ Nevertheless, one who is legally "aggrieved" by a judgment may become a party of record and obtain a right to appeal by moving to vacate the judgment pursuant to Code of Civil Procedure section 663. (*Eggert* v. *Pac. States S. & L. Co.,* 20 Cal.2d 199, 201 [124 P.2d 815]; *Elliott* v. *Superior Court,* 144 Cal. 501, 509 [77 P. 1109]; *Estate of Partridge,* 261 Cal.App.2d 58, 60-63 [67 Cal.Rptr. 433]; *Butterfield* v. *Tietz,* 247 Cal. App.2d 483, 484-485 [55 Cal.Rptr. 577]; *Estate of Sloan,* 222 Cal.App.

---

[4] Under Code of Civil Procedure section 387 the trial court had broad discretion to permit or deny intervention. (See *Hausmann* v. *Farmers Ins. Exchange,* 213 Cal. App.2d 611, 615-616 [29 Cal.Rptr. 75].) Although CWRO has also appealed from the order denying intervention, we need not consider whether the trial court abused its discretion, since our disposition of these proceedings leaves the issue moot.

2d 283, 291-292 [35 Cal.Rptr. 167].) ▮ One is considered "aggrieved" whose rights or interests are injuriously affected by the judgment. (*Elliott* v. *Superior Court, supra,* at p. 509; see *Leoke* v. *County of San Bernardino,* 249 Cal.App.2d 767, 770-771 [57 Cal.Rptr. 770]; *Buffington* v. *Ohmert,* 253 Cal.App.2d 254, 255 [61 Cal.Rptr. 360].) Appellant's interest " 'must be immediate, pecuniary, and substantial and not nominal or a remote consequence of the judgment.' " (See *Leoke* v. *County of San Bernardino, supra,* at p. 771.)

In the instant case, the judgment in the Alameda action, and the peremptory writ of mandate issued pursuant thereto, ordered defendant Carleson to amend or reinterpret his regulations in a manner which would, and did,[5] have the effect of terminating AFDC grants to welfare recipients such as the individual applicant-interveners and others represented by CWRO. The Alameda judgment was the initial essential step in the process ultimately resulting in the termination of benefits which, as noted in *Goldberg* v. *Kelly,* 397 U.S. 254, 262 [25 L.Ed.2d 287, 295-296, 90 S.Ct. 1011], "are a matter of statutory entitlement for persons qualified to receive them. Their termination involves state action that adjudicates important rights." (See also fn. 8 at p. 262 [25 L.Ed.2d at pp. 295-296].) ▮ Accordingly, it seems without question that CWRO[6] and its members were legally "aggrieved" by the Alameda judgment, which had an immediate, pecuniary and substantial effect upon their right to AFDC benefits.

The trial court ordered CWRO's motion to vacate "stricken" rather than simply denying it, evidently on the basis that such a motion is unavailable to review judicial error.[7] ▮ It is true that ordinarily a trial court cannot correct judicial, as distinguished from clerical, error except in accordance with statutory procedures. (*Greene* v. *Superior Court,* 55 Cal.2d 403, 405-406 [10 Cal.Rptr. 817, 359 P.2d 249]; *Duff* v. *Duff,* 256 Cal.App.2d 781, 785 [64 Cal.Rptr. 604]; *Douglas* v. *Douglas,* 164 Cal.App.2d 225, 228-

---

[5]Carleson's emergency regulation, adopted pursuant to the judgment in the Alameda action, became effective on June 1, and had the immediate effect of terminating aid to thousands of former welfare recipients. Our stay orders of June 14 and June 23 did not have the effect of restoring lost benefits to those recipients.

[6]In *California Welfare Rights Organization* v. *Carleson, supra,* 4 Cal.3d 445, we impliedly acknowledged CWRO's standing to litigate on behalf of welfare recipients questions concerning California's compliance with the Social Security Act.

[7]Counties had also contended that CWRO's appeal from the order denying intervention automatically stayed further proceedings regarding any of CWRO's claims (Code Civ. Proc., § 916, subd. (a)), and that the trial court consequently had no jurisdiction to entertain its motion to vacate. Section 916, however, stays only those proceedings pertaining to the subject matter of the appeal, namely, the question of CWRO's intervention. The trial court could have properly proceeded to rule upon any further matters not related to the appeal. (See *Olson* v. *Hopkins,* 269 Cal.App.2d 638, 644-645 [75 Cal.Rptr. 33].)

229 [330 P.2d 655].) ■ Section 663, however, furnishes sufficient statutory basis for CWRO's motion in the instant case. That section in part provides that a judgment may on motion be vacated for "Incorrect or erroneous conclusions of law not consistent with or not supported by the findings of fact . . . ." We interpret that language to mean that the motion may be made whenever the trial judge draws an incorrect legal conclusion or renders an erroneous judgment upon the facts found by it to exist. (See *Howard A. Deason & Co.* v. *Costa Tierra Ltd.*, 2 Cal.App.3d 742, 760 [83 Cal.Rptr. 105]; 3 Witkin, Cal. Procedure, pp. 2096-2097.)

In the instant case, CWRO has contended that the trial court incorrectly concluded, on the basis of the findings of fact (which included applicable provisions of the Social Security Act), that existing regulations promulgated and interpreted by Carleson were invalid. If the court's conclusion was indeed incorrect, that error could have been reviewed by a motion to vacate, under section 663. ■ We conclude, therefore, that CWRO became a party of record to the Alameda action, that it had standing to appeal from the judgment in that case, and that consequently this court has jurisdiction to determine the substantive issues raised in its appeal.

### 2. *The Substantive Issues*

As previously explained, in the Alameda action counties sought and obtained a judgment declaring invalid and enjoining further implementation of certain regulations issued and interpreted by Carleson and relating to eligibility for AFDC grant payments. These regulations were promulgated to implement certain provisions of the Social Security Act ("the Act") designed to provide an incentive to employment for recipients of AFDC grants by permitting them to exclude a portion of their earned income, and to deduct from income their work-related expenses, in determining whether their level of income qualifies them for an AFDC payment. The counties contended, and the trial court held, that Carleson's regulations permitted more generous exclusions and deductions than authorized by the Act, thereby denying equal protection of the law to other welfare applicants and sanctioning an illegal gift of public funds. Accordingly, the trial court ordered Carleson to amend or reinterpret his regulations to conform to the Act.

#### a. *The income-disregard exclusion*

As we explained in *California Welfare Rights Organization* v. *Carleson*, *supra*, 4 Cal.3d 445, 448-449, the Act (42 U.S.C. § 601) makes federal funds available to those states which have submitted and had approved by the Department of Health, Education and Welfare ("HEW") a plan for aid

and services to needy families with children. Although the AFDC program is elective, once a state chooses to join, its plan must comply with the mandatory requirements established by the Act, as interpreted and implemented by regulations promulgated by HEW. (See also *King* v. *Smith*, 392 U.S. 309, 316-317 [20 L.Ed.2d 1118, 1125-1126, 88 S.Ct. 2128].) California has elected to join the AFDC program, and under existing California law Carleson, as Director of the Department of Social Welfare, must establish regulations not in conflict with federal law (Welf. & Inst. Code, § 10604), and must administer the state program "to secure full compliance with the applicable provisions of state and federal laws" (Welf. & Inst. Code, § 10600).

One of the requirements of the Act is that each state, in determining whether a particular family qualifies for aid, ". . . shall with respect to any month disregard . . . the first $30 of the total of [the family's] earned income for such month plus one-third of the remainder of such income for such month . . . except that, with respect to any month, the State agency shall not disregard any earned income . . . [of the persons in the family] if with respect to such month the income of the persons so specified . . . was in excess of their need as determined by the State agency . . . [without considering the $30 plus one-third disregard of earned income], *unless, for any one of the four months preceding such month, the needs of such persons were met by the furnishing of aid under the plan. . . .*" (Italics added; 42 U.S.C. § 602, subd. (a)(8); see 45 C.F.R. § 233.20, subd. (a)(11)(ii)(b)(2).)

With the exception of the italicized clause, the parties are in agreement regarding the correct interpretation of this provision. In essence, it requires the state to disregard the specified portion of a family's earned income in determining eligibility for, and amount of, an AFDC grant. The exclusion is available to all families except those whose earned income exceeds their standard of need (as determined by the state), and whose "needs" have not been met by an AFDC payment within the past four months.[8]

The primary dispute between the parties herein involves the application of the statutory disregard to families whose earned income exceeds their

---

[8]For example, assume that families X and Y each have a standard of need of $350 per month. During the past four months, both families have been unemployed but only family X had applied for and received an AFDC grant. In the next month, both families earn income of $480, and both apply for aid. Family Y would receive no grant: Its earned income (assuming no work-related expenses, a matter discussed below) exceeded its standard of need, and it had received no AFDC grant within the past four months. On the other hand, family X, being entitled to disregard the specified portion of its earned income, would receive a grant of $50, computed as follows: $480 earned income, less $30 statutory disregard leaves $450, less one-third of $450 ($150) leaves $300; X receives a grant of $50 representing the excess of its standard of need ($350) over its remaining earned income ($300).

standard of need. Carleson had been interpreting the statutory language to mean that any such family would be entitled to the disregard if it had received an AFDC grant within the past four months.[9] Counties, on the other hand, contended that those recipients of prior grants whose earned income exceeded their standard of need within the past four months should be denied the benefit of the disregard, since their "needs" during that period had been met entirely by their earned income and not by the aid they received. In other words, only those recipients of prior grants whose standard of need had exceeded their earned income within the past four months would be entitled to continue to disregard a portion of that income.[10]

The trial court agreed with the counties' interpretation of the Act and ordered Carleson to "amend SDSW-EAS 44-111.25 (or alter the interpretation of that regulation) so as to provide that an employed applicant for AFDC aid must first demonstrate eligibility without a deduction from his earned income of the 'disregard,' but with a deduction of his 'work-related expenses,' such eligibility being then determined by comparing the net income so derived to the appropriate standard of need established by defendants; and that if four successive months have passed when an employed recipient would not have been eligible for aid as an applicant, then commencing with the fifth month such recipient shall be required to re-establish eligibility as an applicant (as provided in this paragraph) and not as a recipient . . . ."[11]

The trial court's interpretation of section 602, subdivision (a)(8), was based, at least in part, upon its determination that a contrary interpretation would deny equal protection to other applicants for AFDC aid, and would constitute an illegal gift of public funds. Before we consider these issues, we first must determine whether the court correctly interpreted the Act.

It seems reasonably clear that the court's interpretation was erroneous. As we shall point out, the income-disregard provisions were adopted by

[9]Carleson's prior regulation, EAS 44-111.25, merely adopted the statutory language; it was his *interpretation* of that language which counties sought to restrain, not the regulation itself.

[10]Relating counties' contention to the hypothetical example in footnote 8, *ante,* family X had earned income of $480, less a statutory disregard of $180, leaving $300 earned income to be considered in determining its grant. If family X continued to earn $480 for four months, under counties' theory X's "needs" (fixed by the state at $350) would have been met wholly from its earned income ($480). Since its earned income exceeded the standard of need, the fact that X had been receiving AFDC payments within the past four months would be irrelevant and X would not be entitled to the benefit of the statutory disregard for the following month and would receive no grant. Thus, families X and Y would be treated equally in determining their eligibility for a payment during the fifth month.

[11]On April 29, Carleson issued emergency regulation EAS 44-111.25, effective June 1, incorporating the language of the court's judgment.

Congress to furnish AFDC recipients with an incentive to obtain and maintain an employment status. Under the trial court's analysis of section 602, a recipient family whose earned income (less work-related expenses) exceeded its standard of need for the past four months would be required to establish eligibility for further aid without the benefit of the income-disregard provisions. The family's entire net income would be considered in determining eligibility, thereby substantially reducing the incentive to continue employment.[12]

■ It is, of course, proper for the court to consider the legislative history underlying the adoption of the income-disregard provision. (See *Mooney* v. *Pickett,* 4 Cal.3d 669, 677, and fn. 9 [94 Cal.Rptr. 279, 483 P.2d 1231].) That history discloses that this provision was to be available as an incentive toward employment to all recent (i.e., within the past four months) recipient families, even though their current earned income exceeds their standard of need. The Senate committee report states that "A key element in any program for work and training for assistance recipients is an incentive for people to take employment. If all the earnings of a needy person are deducted from his assistance payment, he has no gain for his effort . . . . The committee believes that this provision [the income-disregard provision] will furnish incentives for members of public assistance families to take employment and, in many cases, increase their earnings to the point where they become self-supporting. [Par.] . . . The earnings exemption provisions will apply to the AFDC program *only if for any one of the past 4 months the family was eligible for a payment.* This provision gives people an opportunity to try employment without worrying about forfeiting their eligibility to receive assistance if their employment terminates quickly." (Italics added; 1967 U.S. Code Cong. & Admin. News, pp. 2994-2995; see pp. 2861, 3118.)

The trial court's interpretation of section 602 would deprive certain recipients of the benefit of the income-disregard provisions even though they had been eligible for an AFDC payment in the past four months, contrary to the foregoing legislative intent. Moreover, that interpretation would impede, rather than promote, the employment incentives which lie at the heart of the disregard device since, as the committee noted, "If all the

---

[12]The incentive furnished by the disregard provision encourages family members to obtain employment without risking a total loss of welfare benefits. If each additional dollar earned in employment resulted in a dollar reduction in benefits, that incentive would be substantially inhibited. Under the trial court's ruling, a recipient family whose income exceeded its needs would be permitted the benefit of the disregard for four months only, a period which would furnish little incentive to obtain employment.

earnings of a needy person are deducted from his assistance payment, he has no gain for his effort."

Aside from the legislative history, at least one court has assumed, without expressly deciding the point, that the four months' limitation under section 602 "limits eligibility for the income exclusion benefits of those whose income exceeds their needs *to those who received aid in one of the preceding four months* and denies the benefit of the income exclusion provision to those who have not received such aid within one of the past four months." (Italics added; *Conner* v. *Finch* (N.D.Ill. 1970) 314 F.Supp. 364, affd. *sub nom. Conner* v. *Richardson* (1971) 400 U.S. 1003 [27 L.Ed.2d 618, 91 S.Ct. 575].)[13] Thus, as to those families whose earned income exceeds their standard of need, it is the prior *receipt of aid* which determines the availability of the disregard. That such a family has continued to require assistance is, under federal law, indicative that it has not yet attained self-sufficiency and requires continued employment incentives.[14]

Finally, it is apparent that the interpretation of the trial court would conflict with the mandate of our Legislature to permit the exclusion of earned income "To the maximum extent permitted by federal law" (Welf. & Inst. Code, § 11008). Section 11008 declares that "In order that recipients of public assistance may become self-supporting and productive members of their communities, it is essential that they be permitted to earn money without a proportionate deduction in their aid grants. It is the intention of the Legislature to promote this objective to the extent possible within the limitations imposed by federal law, and the department, in implementing public assistance laws, is directed to do so in the light of this objective . . . . [Par.] To the maximum extent permitted by federal law,

---

[13]It is also significant that on May 10, HEW informed Carleson by letter that emergency regulation EAS 44-111.25 "appears to be inconsistent with Federal law and the clear intent of Congress," and notified Carleson of its intent to invoke a compliance hearing unless that regulation be rescinded or amended to conform with federal law. HEW's views are, of course, subject to considerable deference by this court. (See *Lewis* v. *Martin*, 397 U.S. 552, 559 [25 L.Ed.2d 561, 567, 90 S.Ct. 1282]; *Rosado* v. *Wyman*, 397 U.S. 397, 406 [25 L.Ed.2d 442, 452, 90 S.Ct. 1207].)

[14]In essence, the trial court equated the term "needs" under section 602, subdivision (a)(8), with the standard of need established by the state. In other words, under the court's analysis of the statutory language, a family's "needs" would be met whenever its earned income (less work-related expenses) exceeded the standard of need fixed by the state. These standards, however, are "*minimum* basic standards of adequate care" (italics added; Welf. & Inst. Code, § 11452), and are not necessarily reflective of actual need. (See *California Welfare Rights Organization* v. *Carleson, supra*, 4 Cal.3d 445, 448-452.) Accordingly, the fact that a family's earned income exceeded its standard of need does not inevitably indicate that its *actual* needs for assistance have been met. The Act itself distinguishes between the general concept of "needs," and the administratively-fixed "need as determined by the State agency." (See § 602, subd. (a)(8)(D).)

earned income of a recipient of aid under any public assistance program for which federal funds are available shall not be considered income or resources of the recipient, and shall not be deducted from the amount of aid to which the recipient would otherwise be entitled." (See also Welf. & Inst. Code, § 11205.) Therefore, even if we were to hold section 602, subdivision (a), ambiguous and subject to two reasonable interpretations, section 11008 would require us to adopt the interpretation chosen by Carleson prior to the Alameda judgment, unless that interpretation were constitutionally impermissible.

The Alameda court found two constitutional impediments to interpreting section 602 as allowing all prior AFDC recipients the benefits of the income-disregard provision even though their employment income exceeded their standard of need. First, the court held that such favored treatment would unlawfully discriminate against initial applicants for aid.[15]

There is conclusive evidence, however, that Congress was aware of the difference in treatment afforded prior recipients and initial applicants for aid, and that Congress purposely sanctioned the distinction in order to carry out the overriding legislative policy to limit the number of persons joining welfare rolls, and to foster employment incentives for existing welfare recipients. Thus, the Senate committee report states that: "The bill contains provisions which will prevent increasing the number of persons receiving AFDC as a result of the earnings exemptions. The provisions discussed above are to become available for AFDC only with respect to persons whose income was not in excess of their needs as determined by the State agency without the application of this provision itself. That is, only if a family's total income falls below the standard of need will the earnings exemption be available. One possible result of this provision is that one family, who started out below assistance levels, will have some grant payable at certain earnings levels because of the exemption of earnings received after going on the rolls while another family which already had the same earnings will not be eligible for an assistance grant. The committee appreciates the objections to this type of situation which can be made; but the alternative would have increased the costs of the proposal by about $160 million a year by placing people on the AFDC rolls who now have earnings in excess of their need for public assistance as determined under their State plan. In short, the various provisions included in the committee's bill are designed to get people off AFDC rolls not put them on." (1967 U.S. Code Cong. & Admin. News, *supra,* pp. 2995-2996.)

[15]See, e.g., footnote 8, *ante,* in which family Y was not permitted to disregard any earned income for the reason that its earned income exceeded its standard of need and it had not received aid in the past four months.

Thus, the benefits of the income-disregard provision were intended primarily as an employment incentive to persons already on welfare, to encourage them to obtain and maintain an employment status until their salary (excluding disregarded income and expenses) exceeds their standard of need. However, Congress did not intend to encourage persons not already receiving assistance, whose earned income exceeded their standard of need, to join welfare rolls.

The foregoing legislative purposes are sufficient to defeat the contention that the Act, as interpreted and implemented by Carleson prior to the Alameda judgment, is invalid under equal protection principles. In *Conner* v. *Finch, supra*, 314 F.Supp. 364, the court rejected an identical attack upon the Act. The court candidly acknowledged that there may be considerable "social merit" in the position that all applicants should be entitled to disregard a portion of their income in determining their eligibility for aid, to the end that welfare benefits might be increased for all needy families. The court noted, however, that "our analysis of the problem may not be in terms of what we believe to be the most desirable social policy for this state and our nation. [Par.] Rather, as pointed out by the Court in Dandridge v. Williams [397 U.S. 471 (25 L.Ed.2d 491, 90 S.Ct. 1153)] our review is limited to a determination of whether the provisions here under attack, and the distinctions found therein have some reasonable basis." (314 F.Supp. at p. 369.) The court concluded that "The congressional enactment and the state regulation, though not free of inequities and inconsistencies, are supported by acceptable and what even plaintiffs agree to be laudable legislative objectives. As defendants have explained, the thrust of the AFDC changes in the Social Security Amendments of 1967, was to attempt to make more families self sufficient. The income exclusion provisions were considered as potentially an attractive incentive toward employment. By accepting employment, the federal and state governments save two-thirds of their former payments . . . . For these reasons, we conclude that the statutory provisions here sought to be declared unconstitutional and their enforcement enjoined, are constitutionally valid and enforceable." (P. 370.) The court's judgment was affirmed by the United States Supreme Court. (400 U.S. 1003 [27 L.Ed.2d 618, 91 S.Ct. 575].)

Therefore, the trial court in the Alameda action incorrectly held that the Act, as implemented and interpreted by Carleson, was unconstitutional under equal protection principles. As an alternative holding, the trial court also held that payment of aid pursuant to the income-disregard provision as interpreted by Carleson would violate the provisions of our state Constitution prohibiting gifts of public funds. (Art. XIII, § 25, formerly art. IV, § 31.) The court reasoned that "payment of benefits for an indefinite period

after employment income meets or exceeds need can accomplish nothing to encourage self sufficiency or to relieve taxpayers of the burden of perpetual support. Encouragement of artificial dependency, and the inequitable distribution of public funds long after need has ceased, is so unreasonable as to require that it be declared . . . as amounting to a gift of public funds."

Initially, it is evident that the trial court misinterpreted the actual effect of the income-disregard provisions. That effect is not to require payment of AFDC benefits in perpetuity; the statutory exclusion becomes unavailable if the recipient has, during the past four months, failed to qualify for and receive a payment.[16] True, as an incentive to maintain his employment status, the recipient is given the benefit of the income-disregard provisions in determining whether he qualified during that period. However, given the legitimacy of the incentive device, that benefit does not result in any "artificial dependency" or "inequitable distribution" of public funds.

Article XIII, section 25, of the state Constitution provides that "The Legislature shall have no power . . . to make any gift or authorize the making of any gift . . . of any public money or thing of value to any individual . . . ; provided, that nothing in this section shall prevent the Legislature granting aid pursuant to Section 21 of this article . . . ." Section 21 of article XIII (formerly art. IV, § 22), permits, among other things, grants of aid to institutions conducted for the support of minor orphans, abandoned children, children of a father incapacitated for gainful work by a permanent disability, or indigent aged persons, and authorizes direct grants to needy blind or physically handicapped persons. Since section 21 does not expressly exempt AFDC grants from the provisions of section 25, we must determine whether the making of such grants in the manner specified by the Act, as interpreted by Carleson, constitutes an unlawful gift of public funds.

It is generally held that in determining whether an appropriation of public funds is to be considered a gift, the primary question is whether the funds are to be used for a "public" or "private" purpose; the benefit to the state from an expenditure for a public purpose is in the nature

---

[16]Thus, referring back to the hypothetical example in footnote 8, *ante,* if family X (with a standard of need of $350 per month) received earned income in excess of $555 per month for four months, it would be deemed self-sufficient under federal law, would receive no grant during those months, and would no longer be entitled to the statutory disregard. ($555, less $30 is $525; one-third of $525 is $175; $525 less $175 is $350. A salary in excess of $555 would exceed the standard of need even if the disregard were applied.)

of consideration and the funds expended are therefore not a gift even though private persons are benefited therefrom. (*County of Los Angeles* v. *La Fuente,* 20 Cal.2d 870, 876-877 [129 P.2d 378]; *County of Alameda* v. *Janssen,* 16 Cal.2d 276, 281 [106 P.2d 11, 130 A.L.R. 1141].)

The determination of what constitutes a public purpose is primarily a matter for the Legislature, and its discretion will not be disturbed by the courts so long as that determination has a reasonable basis. (*County of Alameda* v. *Janssen, supra,* at p. 281; see *Dittus* v. *Cranston,* 53 Cal.2d 284, 286 [1 Cal.Rptr. 327, 347 P.2d 671].) Accordingly, a wide variety of welfare and other social programs have been upheld against constitutional challenge. (See *County of Los Angeles* v. *La Fuente, supra* (aid to needy aged); *County of Alameda* v. *Janssen, supra* (release of liens on property owned by indigent welfare recipients); *San Francisco* v. *Collins,* 216 Cal. 187 [13 P.2d 912] (aid to indigent sick and poor persons); *Doctors General Hospital* v. *County of Santa Clara,* 188 Cal.App.2d 280 [10 Cal.Rptr. 423] (tax refund to certain charitable institutions); *Goodall* v. *Brite,* 11 Cal.App.2d 540 [54 P.2d 510] (hospital care to paupers and others unable to afford private care).)

In the *Janssen* case, *supra,* this court upheld legislation aimed at releasing certain liens against property owned by indigent recipients of aid for the reason that the Legislature could reasonably have determined that such legislation was in the best interests of the general public welfare; a release of liens could remove the necessity for additional direct aid to the property owner and thereby relieve the public treasury. Similarly, with respect to AFDC grants, the Legislature could reasonably conclude (as it did in Welf. & Inst. Code, §§ 11008 and 11205) that employment incentives are essential to accomplish the goal of self-sufficiency, and that the income-disregard provision was a necessary and proper device for encouraging employment, toward the ultimate goal of getting people *off* of welfare rolls.[17] And though there may occur isolated instances in which this provision fails to accomplish its purpose and relatively non-needy individuals are given public assistance,[18] the Legislature could have reasonably determined that the risk

[17]As noted in *Conner* v. *Finch, supra,* 314 F.Supp. 364, 370, the income-disregard provision may indeed represent a revenue-saving device, preserving public funds. By encouraging welfare recipients to try employment, the welfare rolls could be substantially reduced.

[18]We should mention that the concept of "need" is, of course, a relative one and that persons may properly qualify for aid in this state without establishing their total indigence. (See *County of San Mateo* v. *Boss,* 3 Cal.3d 962, 970 [92 Cal.Rptr. 284, 479 P.2d 654]; *County of San Bernardino* v. *Simmons,* 46 Cal.2d 394, 400 [296 P.2d 329].) Moreover, as pointed out in footnote 14, *ante,* the standards of need established by the states are not necessarily reflective of actual need; a family whose earned income exceeds his statutory standard of need may nevertheless be in need of public assistance.

of such abuses was outweighed by the substantial financial and social benefits resulting from California's participation in the AFDC program.[19]

■■ ■■ We conclude that California's compliance with the income-disregard provisions of the Act, as we have interpreted them, would result in neither a denial of equal protection to other AFDC applicants nor an unlawful gift of public funds.

### b. *The work-related expenses deduction*

In addition to disregarding a portion of earned income, as discussed above, a state AFDC plan must also provide that the state agency shall take into consideration in determining need "any other income and resources [of any claimant] . . . as well as any expenses reasonably attributable to the earning of any such income . . . ." (42 U.S.C. § 602, subd. (a)(7); see 45 C.F.R. § 233.20, subd. (a)(3)(iv)(a).)

In the Alameda action, counties took the position that Carleson's existing regulations interpreting and implementing the foregoing provision (see regulations EAS 44-113, 44-114, 41-309) improperly permitted AFDC applicants to deduct from their earned income all work-related expenses actually incurred, without regard to the reasonableness of the amount expended. The counties also contended that Carleson's regulations improperly permitted the exclusion from income of certain involuntary deductions, such as income tax withholding and pension fund contributions, without provision for including such amounts when ultimately refunded or paid to the employee. Finally, counties objected to Carleson's allowance of a standard deduction (ranging from $6 to $25 per month) for work-related food, clothing and incidental expenses, whether or not the employee had actually incurred expenses in that amount. The trial court held Carleson must amend or reinterpret his regulations to provide for the deduction of only a reasonable amount of work-related expenses actually incurred in producing income, up to certain maximum levels, and for the inclusion as deferred income of monies ultimately refunded or returned to the employee. We have concluded that the trial court erred in both respects.

The legislative history underlying the work-related expenses deduction

[19]In *California Welfare Rights Organization* v. *Carleson, supra,* 4 Cal.3d 445, 453-454, we noted that "some 400,000 needy families in California presently receive benefits under the AFDC program, that the present annual cost of operating the program approximates one billion dollars with about one-half of the funds being contributed by the federal government," and that it is the public policy of this state to establish and maintain conformity between state law and the federal requirements since public assistance programs "are of tremendous financial and social consequence to this state . . . ."

provision indicates that it was the intent of Congress to permit the exclusion of *all* such expenses, without regard to the amount expended, provided that such expenses were reasonably related to employment. "The committee [Senate Committee on Finance] believes that it is only reasonable for the States to take these expenses [of earning income] *fully* into account. Under existing law if these work expenses are not considered in determining need, they have the effect of providing a disincentive to working since that portion of the family budget spent for work expenses has the effect of reducing the amount available for food, clothing and shelter. The bill has, therefore, added a provision in all assistance titles requiring the States to give consideration to *any* expenses reasonably attributable to the earning of income." (Italics added; 1962 U.S. Code Cong. & Admin. News, pp. 1959-1960.)

In addition to the legislative history, HEW regulations provide that in determining eligibility for aid, "only such net income as is *actually available* for current use on a regular basis will be considered . . . ." (Italics added; 45 C.F.R., § 233.20, subd. (a)(3)(ii)(c).)  ▇▇▇  The legislative history, together with these regulations (which have been adjudged to "clearly comport" with the Act, *King* v. *Smith, supra*, 392 U.S. 309, 319 [20 L.Ed.2d 1118, 1126]; *Lewis* v. *Martin, supra*, 397 U.S. 552, 555 [25 L.Ed.2d 561, 565]), compel the conclusion that *all* work-related expenses must be considered in determining eligibility, for those expenses necessarily reduce the net income "actually available" for current support needs. To disallow a portion of those expenses as "unreasonable" would undermine the primary purpose of the deduction to provide further incentives toward employment. Moreover, Congress might well have concluded that the administrative costs of attempting to determine or review the reasonableness of any particular work-related expenditure outweighed the cost to the AFDC program of permitting the occasional deduction of excessive expenses.[20]

A similar issue was raised in *Williford* v. *Laupheimer* (E.D.Pa. 1969) 311 F.Supp. 720, wherein the State of Pennsylvania attempted to impose a $50 maximum upon the work-related expenses deduction under section 602, subdivision (a). The court agreed that the limitation was not permitted by the Act and HEW regulations thereunder, and concluded as follows:

---

[20] The foregoing reasoning would also sustain Carleson's standard monthly allowance for increased personal expenses attributable to employment. The administrative convenience afforded by a standard allowance in a reasonable amount provides justification for deviating from the general principle that only those expenses actually incurred may be deducted from income. (See *Rosado* v. *Wyman, supra*, 397 U.S. 397, 419 [25 L.Ed.2d 442, 459]; *Amos* v. *Engelman* (D.C.N.J. 1970) [C.C.H. Pov. L.Rptr., par. 11,983]; HEW Handbook of Public Assistance Administration, Part IV, § 3140.)

"And although we may sympathize with the state's attempt to alleviate the unquestionably and increasingly heavy burden of programs such as AFDC, the solution of such problems resides in Congress. To date, it has not seen fit to impose any limitation of work-related income deductions; the states are not free to do otherwise." (P. 722.)

Of course, our interpretation of the Act and regulations thereunder does not foreclose the state from disallowing in whole or in part those expenses which are not reasonably attributable to the production of income. For example, if an automobile were not required by the nature of one's employment, or if other feasible means of transportation were available, the state could properly disallow at least a portion of the expense of acquiring and maintaining an automobile, not because the *amount* expended was unreasonable, but because the *type* of expenditure was not a bona fide work-related expense subject to the statutory deduction.

With respect to such involuntary deductions as tax withholding or pension plan contributions, it seems clear that such deductions from income are proper since only *net* income available for current use on a regular basis should be considered in determining eligibility. (45 C.F.R., § 233.20, subd. (a)(3)(ii)(c).) The question arises whether, upon refund or repayment of these funds to the employee, the amounts refunded or repaid should then be considered as income. California has heretofore distinguished between nonrecurring lump sum payments (considered as personal property, rather than income, for purposes of eligibility),[21] and payments recurring over a period of two or more months (treated as income). (Regulation EAS 41-309.) Contrary to the trial court's holding in the Alameda action that all such payments be treated as deferred income, the HEW regulation cited above permits the state to consider as income only those funds received "on a regular basis." Consequently, California's distinction between recurring and non-recurring payments comports fully with the federal requirements.

We conclude that Carleson's original interpretation and implementation of the income-disregard exclusion and work-related expense deduction were in conformity with the Social Security Act and HEW regulations promulgated thereunder, and were not constitutionally infirm. Accordingly the judgment in the Alameda action (S.F. 22820) is reversed in its entirety, and the Alameda County Superior Court is instructed to vacate the peremptory writ of mandate issued therein and to order defendant Carleson to rescind emergency regulation EAS 44-111.25 promulgated pursuant thereto

---

[21]As a general proposition, no AFDC aid is available to families having personal property in excess of $600. (Welf. & Inst. Code, § 11257.)

and to take whatever steps may be necessary to reinstate, with retroactive benefits, all prior recipients of aid improperly terminated from the AFDC program by reason of said regulation. Inasmuch as all the substantive issues presented in this controversy have been resolved and all appropriate relief afforded in S. F. 22820, no useful purpose would be served by further proceedings in Sac. 7898, S.F. 22816, or S.F. 22817. Accordingly, the appeal in Sac. 7898 is dismissed as moot, the alternative writs of prohibition and mandate issued in S.F. 22816 and S.F. 22817, respectively, are discharged, and the peremptory writs sought in those cases are denied.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Mosk, J., and Sullivan, J., concurred.