[L.A. No. 31484. Nov. 8, 1984.]

WARREN H. BARME, JR., et al., Plaintiffs, v.
GAYANNE WOOD et al., Defendants and Respondents;
CITY OF HUNTINGTON PARK, Intervener and Appellant.

**COUNSEL**

Kegel, Tobin & Hamrick, Kegel & Tobin, Clinton M. Hodges and David E. Lister for Intervener and Appellant.

Burke, Williams & Sorensen and Brian A. Pierik as Amici Curiae on behalf of Intervener and Appellant.

Shield & Smith, Home & Clifford, Ball, Hunt, Hart, Brown & Baerwitz, Horvitz & Greines, Horvitz & Levy, Ellis J. Horvitz, Irving H. Greines, S. Thomas Todd, Kent L. Richland and John L. Klein for Defendants and Respondents.

Latham & Watkins, Bryant C. Danner, Donald P. Newell, Joseph A. Wheelock, Jr., and Milton A. Miller as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**KAUS, J.**—In our recent decision in *American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359 [204 Cal.Rptr. 671, 683 P.2d 670],

we reviewed a wide-ranging constitutional challenge to one provision of the Medical Injury Compensation Reform Act of 1975 (MICRA), a section which authorized the periodic payment of damages in medical malpractice actions. (Code Civ. Proc., § 667.7.) We concluded that the provision was constitutional. In this case, we face a somewhat similar challenge to another provision of MICRA, Civil Code section 3333.1, subdivision (b),[1] which precludes a so-called "collateral source" which has provided medical expenses or other benefits to the plaintiff in a medical malpractice case from obtaining reimbursement of those expenses from a medical malpractice defendant. As in *American Bank*, we conclude that the Legislature acted within its constitutional authority in enacting the provision in question.

I

In November 1977, plaintiff Warren H. Barme, Jr., a police officer employed by the City of Huntington Beach, suffered a heart attack while on duty. Shortly thereafter, he underwent open heart surgery at St. Francis Hospital of Lynwood; during the surgery, he sustained brain damage. In April 1978, Barme and his wife brought this action against the hospital as well as a number of doctors and a nurse involved in his treatment, alleging that the brain damage was caused by their negligence.

In September 1978, the City of Huntington Beach, a self-insured workers' compensation carrier, filed a complaint in intervention, seeking to recover from defendants the expenses it had incurred, and was continuing to incur, in providing workers' compensation benefits to Barme. (Lab. Code, § 3852.)[2] The complaint alleged that as of September 1978, the city had

---

[1]Section 3333.1 provides in relevant part: "(a) In the event the defendant so elects, in an action for personal injury against a health care provider based upon professional negligence, he may introduce evidence of any amount payable as a benefit to the plaintiff as a result of the personal injury pursuant to the United States Social Security Act, any state or federal income disability or worker's compensation act, any health, sickness or income-disability insurance, accident insurance that provides health benefits or income-disability coverage, and any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the cost of medical, hospital, dental, or other health care services. Where the defendant elects to introduce such evidence, the plaintiff may introduce evidence of any amount which the plaintiff has paid or contributed to secure his right to any insurance benefits concerning which the defendant has introduced evidence. [¶] (b) *No source of collateral benefits introduced pursuant to subdivision (a) shall recover any amount against the plaintiff nor shall it be subrogated to the rights of the plaintiff against a defendant.*" (Italics added.)
Unless otherwise specified, all section references are to the Civil Code.

[2]Section 3852 provides in relevant part: "The claim of an employee . . . for compensation does not affect his or her claim or right of action for all damages proximately resulting from the injury or death against any person other than the employer. *Any employer who pays or becomes obligated to pay compensation, or who pays, or becomes obligated to pay salary in lieu of compensation . . . may likewise make a claim or bring an action against the third person.* In the latter event, the employer may recover in the same suit, in addition to the

paid approximately $79,000 in such benefits; the total amount of benefits was expected to exceed $150,000. The city asserted that these expenditures were proximately caused by defendants' negligence.

In August 1979, defendants moved for summary judgment with respect to the city's complaint in intervention, maintaining that recovery by the city was barred under section 3333.1, subdivision (b).[3] The city opposed the motion primarily on the ground that section 3333.1, subdivision (b) was unconstitutional under equal protection and due process principles.[4] The trial court disagreed and granted summary judgment in favor of defendants. The city appeals.

## II

In *American Bank*, we summarized the medical malpractice insurance "crisis" which gave rise to the MICRA legislation. "The problem which was the immediate impetus to the enactment of MICRA arose when the insurance companies which issued virtually all of the medical malpractice insurance policies in California determined that the costs of affording such coverage were so high that they would no longer continue to provide such coverage as they had in the past. Some of the insurers withdrew from the medical malpractice field entirely, while others raised the premiums which they charged to doctors and hospitals to what were frequently referred to as 'skyrocketing' rates. As a consequence, many doctors decided either to stop

---

total amount of compensation, damages for which he or she was liable including all salary, wage, pension or other emolument paid to the employee or to his or her dependents. . . ." (Italics added.)

[3]Defendants had earlier moved for judgment on the pleadings on the basis of section 3333.1, subdivision (b), but the trial court had ruled that that motion was premature because defendants had not yet elected to introduce evidence of the workers' compensation benefits received by Barme, an election which the court held was a prerequisite to the application of section 3333.1. Defendants then filed a document indicating their intention to introduce such evidence in the malpractice action, and moved for summary judgment.

[4]In its opposition to the summary judgment motion, the city also argued that its action for reimbursement under Labor Code section 3852 was not covered by section 3333.1, subdivision (b) because the suit was not a "subrogation" action within the meaning of the MICRA provision. The city has not renewed this claim on appeal, apparently conceding that section 3333.1, subdivision (b) was intended to bar an employer's action under section 3852.

That concession appears well-founded. Workers' compensation benefits are one of the collateral source benefits specifically enumerated in section 3333.1, subdivision (a) (see fn. 1, *ante*), and this court—in describing the employer's remedy under section 3852—has observed that "in granting employers the right to sue third parties, the Legislature simply gave statutory recognition to principles of equitable subrogation." (*County of San Diego* v. *Sanfax Corp.* (1977) 19 Cal.3d 862, 876, fn. 7 [140 Cal.Rptr. 638, 568 P.2d 363].) Furthermore, the legislative history of section 3333.1, subdivision (b) indicates quite clearly that this provision was intended to prevail over other statutory subrogation provisions, such as Labor Code section 3852. An earlier draft of subdivision (b) would have preserved a collateral source's subrogation rights when such rights were "expressly provided by statute," but that exception was eliminated before the statute's enactment.

providing medical care with respect to certain high risk procedures or treatment, to terminate their practice in this state altogether, or to 'go bare,' i.e., to practice without malpractice insurance. The result was that in parts of the state medical care was not fully available, and patients who were treated by uninsured doctors faced the prospect of obtaining only unenforceable judgments if they should suffer serious injury as a result of malpractice." (36 Cal.3d at p. 371.)

We explained that MICRA "attacked the problem on several fronts. In broad outline, the act (1) attempted to reduce the incidence and severity of medical malpractice injuries by strengthening governmental oversight of the education, licensing and discipline of physicians and health care providers, (2) sought to curtail unwarranted insurance premium increases by authorizing alternative insurance coverage programs and by establishing new procedures to review substantial rate increases, and (3) attempted to reduce the cost and increase the efficiency of medical malpractice litigation by revising a number of legal rules applicable to such litigation." (*Id.*, at pp. 363-364.)

The collateral source provision before us—like the periodic payment of damages provision at issue in *American Bank*—is one of the provisions of MICRA which was intended to reduce the cost of medical malpractice insurance. Section 3333.1, *subdivision (a)*—which is not at issue here—authorizes a defendant in a medical malpractice action to introduce evidence of a variety of "collateral source" benefits—including health insurance, disability insurance or worker's compensation benefits. Apparently, the Legislature's assumption was that the trier of fact would take the plaintiff's receipt of such benefits into account by reducing damages.[5] Section 3333.1, *subdivision (b)*—the provision challenged here—provides, in turn, that

---

[5]Earlier drafts of section 3333.1, subdivision (a) required the trier of fact to deduct such collateral source benefits in computing damages, but—as enacted—subdivision (a) simply provides for the admission of evidence of such benefits, apparently leaving to the trier of fact the decision as to how such evidence should affect the assessment of damages.

The purpose of section 3333.1, subdivision (a) has generally been viewed as an attempt to eliminate the so-called "double recovery" obtained by plaintiffs who have their medical expenses paid by their own health insurance and still obtain damages for such expenses from defendant tortfeasors. (See Keene, *California's Medical Malpractice Crisis* in A Legislator's Guide to the Medical Malpractice Issue (1976) pages 27, 31. Cf. *Helfend* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 1 [84 Cal.Rptr. 173, 465 P.2d 61, 77 A.L.R.3d 398] [explaining the rationale underlying the traditional "collateral source" rule excluding evidence of such collateral source benefits].) This reasoning does not apply to workers' compensation benefits, because under California law plaintiffs have not been permitted to obtain a double recovery of such benefits. Either the employer has been entitled to obtain reimbursement from the tort recovery (see Lab. Code, § 3850 et seq.) or the tort judgment has been reduced by the applicable workers' compensation benefits obtained by the employee. (See *Witt* v. *Jackson* (1961) 57 Cal.2d 57, 73 [17 Cal.Rptr. 369, 366 P.2d 641].) Nonetheless, the Legislature specifically included workers' compensation benefits in the collateral source benefits covered by section 3333.1, subdivision (a).

"[n]o source of collateral benefits introduced pursuant to subdivision (a) shall recover any amount against the plaintiff nor shall it be subrogated to the rights of a plaintiff against a defendant." The city apparently concedes that this provision was intended to eliminate the right it would otherwise have under Labor Code section 3852 to seek reimbursement from a medical malpractice defendant. It argues, however, that section 3333.1, subdivision (b) is unconstitutional, violating its rights to both due process and equal protection. Neither contention has merit.

## A

The city acknowledges that an employer's right to seek reimbursement from a third party for workers' compensation benefits that the employer is legally obligated to provide is of statutory origin and is properly subject to legislative regulation or abolition.[6] The city contends, however, that the due process clause prohibits the Legislature from *arbitrarily* eliminating this right, and maintains that section 3333.1, subdivision (b) is arbitrary because it bears no rational relation to a legitimate public purpose.

We cannot agree. As we explained in *American Bank,* the Legislature could properly determine, in light of the facts before it, that the public interest of the state would be served by the adoption of measures which reduced the cost of medical malpractice insurance. "By reducing such costs, the Legislature hoped (1) to restore insurance premiums to a level doctors and hospitals could afford, thereby inducing them to resume providing medical care to all segments of the community, and (2) to insure that insurance would in fact be available as a protection for patients injured through medical malpractice." (36 Cal.3d at p. 372.) The retention of adequate medical care and the preservation of adequate insurance coverage are clearly legitimate public interests.

It is just as clear that section 3333.1, subdivision (b) is rationally related to the objective of reducing the cost of medical malpractice insurance. By prohibiting "collateral sources" from obtaining reimbursement from medical malpractice defendants or their insurers, the section obviously reduces the potential liability of such defendants. (See *California Physicians' Service* v. *Superior Court* (1980) 102 Cal.App.3d 91, 97 [162 Cal.Rptr. 266].) The Legislature could rationally conclude that this would lead to lower malpractice insurance premiums.

---

[6]Unlike an employer's right to reimbursement for workers' compensation expenditures, the right of reimbursement enjoyed by some of the other collateral sources enumerated in section 3333.1, subdivision (a) may be guaranteed by federal law. Under federal supremacy principles, of course, in such cases MICRA's provisions will have to yield. (See, e.g., *Brown* v. *Stewart* (1982) 129 Cal.App.3d 331, 341 [181 Cal.Rptr. 112]; *id.,* at pp. 346-347 [conc. opn. of Blease, J.].)

Although the city points out that any savings in malpractice premiums is likely to be offset by higher premiums for workers' compensation, health and disability insurance and the like, that circumstance does not undermine the rationality of the legislation. Assuming that section 3333.1, subdivision (b) would not reduce the total costs caused by malpractice, the Legislature could have determined that by redistributing the financial impact of malpractice among the different types of insurers involved in the health field, the costs would be spread over a wider base, alleviating the immediate problems posed by a growing cadre of uninsured doctors and a potential shortage of medical care.

The city also contends that the legislation is arbitrary because it shifts some of the cost of medical malpractice from *negligent* health care providers to *innocent*—i.e., nonnegligent—employers or insurers. In the first place, to put the matter in perspective, it must be remembered that by and large the insurers who are burdened by the provision have been paid a fee or premium to provide the health or other benefits covered by their policies; employers, like the city in this case, who have chosen to be self-insured presumably have decided that it is in their self-interest to do so in order to save the insurance premium they would otherwise incur. Because the injury in this case arose well after the enactment of MICRA, we can only assume that the city—and other insurers—took into account the elimination of the right to reimbursement in making the relevant economic decisions. In this context, the asserted "innocence" of the employer or insurer has little meaning.

Furthermore, the due process clause does not demand that the Legislature invariably allocate liability on a negligence or fault basis. The Legislature may well have determined that only by shifting some of the costs of malpractice from a negligent defendant to the victim's own "first party" insurers, would the victim retain a realistic opportunity to obtain any damages from malpractice insurance. Insistence on having malpractice defendants and their insurers bear all of the loss might have meant that no malpractice insurance would have been offered or that many doctors would have practiced uninsured. Rather than reducing the malpractice victim's recovery beyond that mandated by other MICRA provisions (see, e.g., § 3333.2, subd. (b) [limiting recovery for noneconomic losses to $250,000]), the Legislature may have decided that it was preferable to require the victim's health or workers' compensation insurer to absorb some of the loss. Policy judgments of this nature are clearly within the legislative prerogative.

B

The city alternatively argues that section 3333.1, subdivision (b) denies equal protection, affording medical malpractice defendants benefits

not afforded to other tort defendants and imposing a burden on employers who provide benefits to victims of medical malpractice that is not imposed on employers in other situations. We rejected a similar argument in *American Bank,* explaining that the statutory changes were limited to medical malpractice actions because that was the area in which the crisis which precipitated the legislation arose. (36 Cal.3d at pp. 370-373.) ■ ■ ■ ■ Since, as we have just discussed, the provisions of section 3333.1, subdivision (b) were clearly intended to alleviate those same problems, the Legislature did not violate equal protection principles in limiting the section's application to medical malpractice actions.[7]

The judgment is affirmed.

Broussard, J., Reynoso, J., Grodin, J., and Lucas, J., concurred.

**MOSK, J.**—I dissent.

In *American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359 [204 Cal.Rptr. 671, 683 P.2d 670], a slim majority of this court approved the shifting of a substantial part of the burden of damages from the tortfeasor to the innocent victim. The purported reason was the desire to reduce premiums for medical insurance and by that means to lower medical and hospital costs.[1] In my dissent in that case I pointed out how vain that purpose had then proved to be. The passage of time has further vindicated my views. In the nine years since adoption of the so-called Medical Injury Compensation Reform Act of 1975, medical and hospital costs have continued to rise astronomically. The only "reform" has been to magnanimously bestow on health providers a generous insulation from much of the responsibility for their more egregious negligence.

---

[7]Although not raised in the trial court, on appeal the city proffers two additional objections to section 3333.1, subdivision (b), contending (1) that it is an impermissible "tax" and (2) that, at least as applied to public employers, it authorizes an unconstitutional "gift of public funds." Both contentions are specious.

First, it is difficult to see how section 3333.1, subdivision (b) can be characterized as a tax at all. It does not purport to raise any public revenue, but simply precludes an employer or insurer from passing on some of the expenses which it is obligated to bear to a third party. Since the Legislature has plenary control over obligations imposed under the workers' compensation system, it clearly had the power to determine that in some cases the employer or its insurer was required to forego reimbursement of its statutorily incurred expenses.

Second, the provision does not embody an improper "gift of public funds." Not only does the section not authorize any payment of funds from the city to the negligent tortfeasor, but, as discussed above, the shift of costs to the employer clearly serves a "public" purpose (see *County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730, 745-746 [97 Cal.Rptr. 385, 488 P.2d 953])—promoting the availability of adequate medical care and adequate malpractice insurance coverage.

[1]The preamble to the legislation referred to the health crisis in terms, inter alia, of "severe hardships for the medically indigent, a denial of access for the economically marginal . . . ." (Stats. 1975-1976, Second Ex. Sess., ch. 2, § 12.5.)

Now the majority compound their error by permitting yet another shift of the burdens of malpractice, this time from the medical malpractice defendant to the plaintiff's employer or workers' compensation carrier. Why the plaintiff's employer or compensation carrier should bear any of the responsibility for the defendant's malpractice defies rational explanation. Once again the only purpose suggested by the majority is a hoped-for reduction in medical malpractice insurance premiums. That the result will be an increase in workers' compensation insurance premiums appears to be ignored. As between the two, which should logically shoulder the burden: the carrier of the tortfeasor or the carrier of the innocent employer? The answer is obvious.

One of the effects of Civil Code section 3333.1 is the shift of the burden of medical malpractice, and the associated insurance costs, to collateral sources. Whether insured or not, the cities that bear this added burden suffer a decrease in revenues, since there is no way in which they can recover their workers' compensation and other expenditures caused by the negligence of the health care provider. For cities that are self-insured, as Huntington Park in the instant case, the effect is a direct reduction in revenues. For cities that are insured by the State Compensation Insurance Fund, the effect is indirect, but no less costly, in that they must pay higher premiums for their workers' compensation insurance.

Local governments have been facing serious problems with rising workers' compensation costs. In 1976, the Institute for Local Government published the result of a two-year study of workers' compensation in the public sector in California. The institute noted that workers' compensation laws and regulations are not "visible public issues" which are the subject of media reporting, but that the costs "are rising at alarming rates in local government" and that "workers' compensation has become an issue of serious concern to public administrators."[2] From fiscal year 1968-1969 to 1972-1973, workers' compensation costs increased by 154 percent. In that same period, the increase was even higher for police (261 percent) and fire (279 percent) employees.[3]

The Workmen's Compensation Study Commission was established in 1963 by Labor Code sections 6200-6240 to study the workers' compensation system and advise the Governor and the Legislature of its findings. The commission report in 1965 found that benefits for employees of insured employers increased from 1953 to 1962 by 195 percent. Medical benefits over the same period rose 137.9 percent while indemnity benefits increased

---

[2]*Through the Roof,* Institute for Local Self Government (1976) pages 4-5.
[3]*Ibid.,* page 12.

by 232.2 percent. The foregoing statistics illustrate that the trend of workers' compensation costs was steadily, and rapidly, increasing in the years prior to 1975 when the Legislature enacted Civil Code section 3333.1, which improvidently added another burden.

The attempt by respondents to isolate medical malpractice insurance as the only coverage that has experienced large cost increases is not justified by the facts. Admittedly there is some indication that medical malpractice insurance premiums were increasing prior to 1975 when section 3333.1 was adopted. However, to shift the burden of those rising costs to employers, including cities which themselves have experienced rising costs for workers' compensation, is not a rational approach to achieve the purported goal of better health care for the residents of California. Indeed, from a public policy aspect, it is counterproductive.

In *Li* v. *Yellow Cab Company* (1975) 13 Cal.3d 804, 811 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], this court made it clear that we must maintain "a system in which liability is based on fault, the extent of fault should govern the extent of liability . . . ." We further declared that contributory negligence must be replaced "by a system under which liability for damage will be borne by those whose negligence caused it in direct proportion to their respective fault." (*Id.*, at p. 813.)

If an employer contributed in any way to the injury of the employee, the recovery by the employer in his employee's suit against a third party tortfeasor will be reduced accordingly. (*Associated Construction & Engineering Co.* v. *Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 829, 846-847 [150 Cal.Rptr. 888, 587 P.2d 684].) But if the employer is entirely free of negligence that caused the employee's injury, as he would generally be in a medical malpractice case, there is a clear violation of the employer's due process rights by shifting the burden from the tortfeasor to him or his carrier.

Section 3333.1 must fall for two elementary reasons. First, it creates an invidious classification, i.e., medical malpractice tortfeasors are permitted to pass on much of the burdens of their negligence to innocent third parties, unlike all other tortfeasors. There is no logical way to distinguish between a medical doctor who negligently severs a victim's artery during surgery and a motorist who negligently severs a victim's artery in an automobile accident. Under even the modest rational relationship test, this discriminatory classification serves no valid state purpose and is therefore untenable. Second, the code section as applied here deprives the innocent employer or his carrier of their property without any semblance of due process.

I would reverse the judgment.

Bird, C. J., concurred.