747 A.2d 195

Vijay NARAYEN, et al.

v.

Ann H. BAILEY.

No. 5394, Sept. Term, 1998.

Court of Special Appeals of Maryland.

March 2, 2000.

Angus R. Everton (Mason, Ketterman & Morgan, on the brief), Hunt Valley, for appellants.

Mark B. McCoy, Owing Mills, for amicus curiae, Carefirst of Maryland, Inc.

C. Christopher Brown (Brown, Goldstein & Levy, LLP, Jerome J. Seidenman and David S. Seidenman, on the brief), for appellee.

Argued before MURPHY, C.J., and WENNER and PAUL E. ALPERT (Retired, specially assigned), JJ.

WENNER, Judge.

This is an appeal by Vijay Narayen, M.D., from a judgment entered by the Circuit Court for Baltimore City in favor of appellee, Ann. H. Bailey. On appeal Doctor Narayen presents us with two questions:

1. Did the trial court err in denying the Appellant's Motion for Remittitur, or in the Alternative, for New Trial, by failing to make specific findings whether the jury's verdict for "past medical expenses—bills" was "excessive" within the parameters set forth in Section 3–2A–05(h) and 3–2A–06 (f), Courts and Judicial Proceedings Article, Maryland Code?

2. Did the trial court err in denying the Motion for Remittitur, or in the Alternative, for New Trial, on the ground that the Appellee's health insurance payments were not "indemnification" because her health insurance policy provided for subrogation in the event of a judgment against a tortfeasor for damages covering the amounts originally paid by the health insurer?

We shall answer the second question in the affirmative, and remand the case to the Circuit Court for Baltimore City for further proceedings consistent with this opinion.

### Facts[1]

The genesis of this appeal is a medical malpractice claim entered by appellee with Maryland's Health Claims Arbitration Office in accordance with Md.Code (1974, 1998 Repl.Vol.),

---

[1]. Appellant appeals only from denial of his post trial motion for remittitur; hence, it is unnecessary for us to recount the facts of the underlying medical malpractice claim.

§ 3–2A–02 of the Courts and Judicial Proceedings Article (CJP).[2] The parties waived arbitration and appellee filed an action in the Circuit Court for Baltimore City, which was tried before a jury. Appellee's medical expenses, which totaled $399.539.00, were stipulated to, and the jury returned a verdict in favor of appellee for $787,613.20. The jury had been given a special verdict sheet, pursuant to CJP § 3–2A–06(f), on which it itemized damages as follows:

| | | |
|---|---|---|
| A. | Past Medical Expenses | |
| | (1) Bills | $399,539.00 |
| | (2) Supplies & Expenses | $6,535.00 |
| B. | Lost Wages | $31,539.00 |
| C. | Non–Economic Losses | $350,000.00 |

Following return of the verdict, Dr. Narayen filed a Motion for Remittitur, or in the Alternative, for New Trial, requesting a reduction of damages because appellee's medical expenses of $399,539.00 had been paid by Blue Cross and Blue Shield of Maryland ("BCBSM"). Moreover, Dr. Narayen claimed the damages were excessive and requested a reduction pursuant to CJP § 3–2A–06(f).

It was determined at a hearing on the doctor's motion for remittitur that, as BCBSM had paid appellee's medical expenses, it retained a subrogation lien for that amount against any judgment entered in favor of appellee. This appeal followed the trial judge's denial of Dr. Narayen's post-trial motion for remittitur or new trial.

## Standard of Review

When an appeal is from an action tried without a jury, such as the matter now facing us, we are required by Md. Rule 8–131(c) to "review the case on both the law and the evidence" and "not set aside the judgment of the trial court on the evidence unless clearly erroneous ..." Our standard of review is more expansive, however, when considering conclu-

---

**2.** Unless otherwise indicated, all references shall be to Maryland Code (1974, 1998 Repl.Vol., 1999 Cum.Supp.), Courts and Judicial Proceedings Article.

sions of law. *In re Michael G.*, 107 Md.App. 257, 265, 667 A.2d 956 (1995).

We are not aware of, nor have we been referred to a Maryland case involving CJP §§ 3–2A–05(h) or 3–2A–06(f). Hence, this is a case of first impression.

 As the Court of Appeals has often said, "the cardinal rule of statutory construction is to ascertain and effectuate legislative intent," *Motor Vehicle Admin. v. Seidel*, 326 Md. 237, 248, 604 A.2d 473 (1992), and that

> ... the beginning point of statutory construction is the language of the statute itself ... When we look at the statutory language, we attempt to give effect to all the words in the statute ... But our endeavor is always to seek out the legislative purpose, the general aim or policy, the ends to be accomplished ... we are not 'precluded from consulting legislative history as part of the process of determining the legislative purpose or goal' of the law.

*Morris v. Prince George's County*, 319 Md. 597, 603–04, 573 A.2d 1346, 1349 (1990) (citations and footnote omitted). Accordingly, in interpreting §§ 3–2A–05(h) and 3–2A–06(f), we can consider similar provisions in our sister jurisdictions, in addition to §§ 3–2A–05(h) and 3–2A–06(f)'s legislative history.

### Discussion

We begin by setting forth §§ 3–2A–05(h) and 3–2A–06(f) as enacted by the General Assembly:

**CJP § 3–2A–05 Arbitration of claim**

(h) Application for modification or correction; request for reduction of damages.—A party may apply to the arbitration panel to modify or correct an award as to liability, damages, or costs in accordance with § 3–222 of this article. The application may include a request that damages be reduced to the extent that the claimant has been or will be paid, reimbursed, or indemnified under statute, insurance, or contract for all or part of the damages assessed.

The panel chairman shall receive such evidence in support and opposition to a request for reduction, including evidence

of the cost to obtain such payment, reimbursement, or indemnity. After hearing the evidence in support and opposition to the request, the panel chairman may modify the award if satisfied that modification is supported by the evidence. The award may not be modified as to any sums paid or payable to a claimant under any workers' compensation act, criminal injuries compensation act, employee benefit plan established under a collective bargaining agreement between an employer and an employee or a group of employers and a group of employees that is subject to the provisions of the federal Employee Retirement Income Security Act of 1974, program of the Department of Health and Mental Hygiene for which a right of subrogation exists under §§ 15–120 and 15–121.1 of the Health General Article, or as a benefit under any contract or policy of life insurance or Social Security Act of the United States ... Except as expressly provided by federal statute, no person may recover from the claimant or assert a claim of subrogation against a defendant for any sum included in the modification of an award.

## CJP § 3–2A–06 Judicial Review

(f) Itemization of certain damages; remittitur.—Upon timely request, the trier of fact shall by special verdict or specific findings itemize by category and amount any damages assessed for incurred medical expenses, rehabilitation costs, and loss of earnings. Damages assessed for any future expenses, costs, and losses shall be itemized separately. If the verdict or findings include any amount for such expenses, costs, and losses, a party filing a motion for a new trial may object to the damages as excessive on the ground that the claimant has been or will be paid, reimbursed, or indemnified to the extent and subject to the limits stated in § 3–2A–05(h) of this subtitle. The court shall hold a hearing and receive evidence on the objection. If the court finds from the evidence that the damages are excessive on the grounds stated in § 3–2A–05(h) of this subtitle, subject to the limits and conditions stated in § 3–2A–05(h) of this subtitle, it may grant a new trial as to such

damages or may deny a new trial if the claimant agrees to a remittitur of the excess and the order required adequate security when warranted by the conditions stated in § 3–2A–05(h) of this subtitle. In the event of a new trial granted under this subsection, evidence considered by the court in granting the remittitur shall be admissible if offered at the new trial and the jury shall be instructed to consider such evidence in reaching its verdict as to damages. Upon a determination of those damages at the new trial, no further objection to damages may be made exclusive of any party's right of appeal. Except as expressly provided by federal law, no person may recover from the claimant or assert a claim of subrogation against a defendant for any sum included in a remittitur or awarded in a new trial on damages granted under this subsection. Nothing in this subsection shall be construed to otherwise limit the common law grounds for remittitur.

Dr. Narayen first contends the trial court erred in making the findings required by CJP § 3–2A–06(f), without complying with CJP § 3–2A–06(f). In other words, Dr. Narayen believes that once evidence has been received that the opposing party has or will be "paid, reimbursed or indemnified under statute, insurance or contract,"[3] the trial court *must* declare the damages excessive. We disagree.

█ § 3–2A–06(f) provides in relevant part:
The court shall hold a hearing and receive evidence on the objection. *If* the court finds from the evidence that the damages are excessive ... it *may* grant a new trial as to such damages or *may* deny a new trial if the claimant agrees to a remittitur of the excess ... (emphasis added.)

Thus, after receiving evidence from the parties, it is within the discretion of the trial court to determine whether the damages are excessive. Nonetheless, the trial court is not required by subsection (f) under such circumstances to declare the damages to be excessive simply because the claimant has been or

---

3. CJP § 3–2A–06(f). ,

will be reimbursed or indemnified for medical expenses by a collateral source.

Our conclusion is supported by § 3–2A–06's legislative history. House Bill 1593 was enacted by the General Assembly as Chapter 596 of the Acts of 1987 to modify §§ 3–2A–05(h) and 3–2A–06(f). The Senate Judicial Proceedings Committee said:

> The bill simply makes the recovery for damages that have been or will be paid to the claimant under certain benefit plans an additional ground for modification of an alleged excessive award. In a case before an arbitration panel, the panel retains complete discretion to accept the motion, hear the evidence in support and opposition to the motion, and determine if a reduction is appropriate. If a reduction is sought in a trial by way of remittitur, the trial judge again has discretion to (1) grant or deny the motion; (2) grant or deny the reduction in award as the evidence presented shall dictate; or (3) grant or deny any other appropriate motion. The plaintiff can reject any proposed offset and obtain a new trial on the issue of damages. The purpose of this bill is to assure procedural fairness to the plaintiff while allowing a defendant the opportunity to show that the plaintiff may be excessively compensated under a damage award.

Senate Judicial Proc. Comm., Summ. Of Comm. Report for House Bill 1593 (1987). Accordingly, § 3–2A–06(f) does not require an automatic reduction of damages simply because appellee has received payment of medical expenses from a collateral source. This is but one factor to be considered.

## The Collateral Source Rule

Before proceeding with the second issue, we will explore the background and evolution of similar legislation in other jurisdictions, which appear in one way or another to affect the common law collateral source rule. The collateral source rule was adopted by us in about 1854 from the English common law. *See* Michael F. Flynn, *Private Medical Insurance and the Collateral Source Rule: A Good Bet?* 22 U.Tol.L.Rev. 39 (1990).

"Since 1899, the collateral source rule has been applied in [Maryland] to permit an injured person to recover in tort the full amount of his provable damages regardless of the amount of compensation which the person has received for his injuries from sources unrelated to the tortfeasor." *Motor Vehicle Admin. v. Seidel*, 326 Md. at 253, 604 A.2d 473 (footnote omitted). "The purpose of the Collateral Source Rule is to preserve an injured party's right to seek tort recovery from a tortfeasor without jeopardizing his or her right to receive insurance payments for medical care." Flynn, *supra*, 22 U.Tol.L.Rev. at 41.

The collateral source rule prohibits a defendant in a medical malpractice action from introducing evidence that the plaintiff has or will recover his medical expenses from sources unrelated to the tortfeasor, such as a private insurer, government insurance (Medicare), liability insurance, worker's compensation, and the like. Consequently, actual or possible recovery of medical expenses from a collateral source may not be considered in awarding damages.

There has long been a continuing debate over the merits of this common law rule, as summarized by Professor Flynn:

Proponents of the Collateral Source Rule primarily argue that an injured plaintiff under tort law is entitled to recover the full value of the harm caused by the culpable defendant. Proponents reason that without the Rule a guilty defendant would be relieved of liability to the extent of the injured plaintiff's insurance coverage ... Moreover, allowing collateral sources to reduce a wrongdoer's liability penalizes an injured party for purchasing insurance ... The insured party does pay a cost ... the prospect of increased premiums.

Opponents of the Collateral Source Rule primarily contend that the Rule sanctions a double recovery for an injured, insured party. By allowing a plaintiff to recover from a wrongdoer for injuries fully compensated by insurance coverage, the plaintiff is paid twice for a single harm ... They further reason that the Rule defeats the purpose

of tort litigation by compensating an injured party for more than the actual loss sustained.

22 U.Tol.L.Rev. at 43–45.

## The Insurance "Crisis"

Beginning in the 1970's, we were faced with what has been referred to as a medical malpractice insurance crisis, which was described as follows by the Supreme Court of California:

> [T]he insurance companies which issued virtually all of the medical malpractice insurance policies in California determined that the costs of affording such coverage were so high that they would no longer continue to provide such coverage as they had in the past. Some of the insurers withdrew from the medical malpractice field entirely, while others raised the premiums which they charged to doctors and hospitals to what were frequently referred to as "skyrocketing" rates. As a consequence, many doctors decided either to stop providing medical care with respect to certain high risk procedures or treatment, to terminate their practice in this state altogether, or to "go bare," i.e., to practice without malpractice insurance. The result was that in parts of the state medical care was not fully available, and patients who were treated by uninsured doctors faced the prospect of obtaining only unenforceable judgments if they should suffer serious injury as a result of malpractice.

*American Bank & Trust Co. v. Community Hospital,* 36 Cal.3d 359, 371, 204 Cal.Rptr. 671, 683 P.2d 670, 677–78 (1984); *see also Barme v. Wood,* 37 Cal.3d 174, 207 Cal.Rptr. 816, 689 P.2d 446 (1984).

Maryland also suffered from this insurance crisis. In the mid 70's Maryland physicians found it more difficult to obtain medical malpractice insurance. As the Court of Appeals noted:

> The General Assembly created Medical Mutual in 1975 when St. Paul Fire and Marine Insurance Company withdrew from the Maryland medical malpractice market, leaving many doctors without access to liability insurance. The General Assembly established Medical Mutual so that the

victims of medical malpractice could receive compensation for their injuries ... While a few wholly private insurance carriers accepted some Maryland business between 1975 and 1985, they withdrew from Maryland in 1985, again leaving Medical Mutual as the sole source of malpractice liability insurance for doctors in the State.

*Medical Mutual Liability Society of MD. v. B. Dixon Evander and Associates, Inc.*, 339 Md. 41, 43, n. 1, 660 A.2d 433 (1995).

### The Nationwide Response

In response to this crisis, many states enacted legislation to modify or abrogate the collateral source rule in medical malpractice cases. Such legislation permits a medical malpractice defendant to present evidence that the injured party received or will receive benefits from a collateral source. Its purpose was to reduce the award of damages when payments from a collateral source were available to the plaintiff, spreading costs between the malpractice insurer and the collateral source. In other words, the intent of the legislatures was to reduce the financial impact of medical malpractice awards, and thus soften the blow to malpractice insurers, and reduce the expense to doctors of purchasing liability insurance.

In reviewing similar legislation in several jurisdictions, we note both substantive and procedural similarities and differences. Several states permit introduction of collateral source evidence in all personal injury tort cases, and others in only medical malpractice cases. Some states permit collateral source evidence to be introduced during trial, while Maryland and others permit introduction of such evidence only in post-verdict proceedings.

In Alaska, Colorado, Connecticut, Florida, Hawaii, Illinois, Iowa, Michigan, Minnesota, Montana, North Dakota, and Pennsylvania, mandatory reduction of compensatory damages by collateral source payments is permitted under certain circumstances.[4] In Alabama, Arizona, California, Delaware,

---

4. *See* ALASKA STAT. § 09.55.548 (Michie 1999), COLO. REV. STAT. ANN. § 13–21–111.6 (West 1997), CONN. GEN. STAT. § 52.225a

Georgia, Indiana, Maryland, Missouri, Oregon, Rhode Island, South Dakota, and Washington state, discretionary reduction is permitted.[5] In many states, however, a plaintiff is permitted to present evidence of the cost of obtaining collateral source benefits as a set off against a portion of such reductions. This enables a plaintiff to recover costs such as insurance premiums.

## Subrogation and Reimbursement Rights

In most states, similar legislation contains provisions as to subrogation or reimbursement rights retained by the collateral source payor. Such rights may not be ignored once the collateral source rule has been modified or eliminated because it is also important to consider the reimbursement rights of the collateral source payor.

Such rights are ordinarily dealt with in several ways. In some states, the plaintiff is permitted to introduce evidence of the plaintiff's obligation to reimburse the collateral source payor after the defendant has introduced such collateral source benefits. In some states, if a collateral source payor retains subrogation rights, reduction is prohibited. For example, CONN. GEN. STAT. § 52.225a (1991) requires a mandatory reduction for the receipt by a plaintiff of collateral source benefits, but "no reduction for (1) a collateral source for which a right of subrogation exists . . ." In Florida, similar legisla-

(1991), FLA. STAT. ANN. § 768.76 (West 1999), HAW. REV. STAT. § 663–22 (1999), 735 ILL. COMP. STAT. ANN. § 5/2–1205 (West 1999), IOWA CODE § 147.136 (1997), MICH. COMP. LAWS ANN. § 600.6303 (West 1999), MINN. STAT. ANN. § 548.36 (West 1999), MONT. CODE ANN. § 27–1–308 (1999), N.Y. C.P.L.R. § 4545(a) (McKinney 1992), N.D. CENT. CODE § 32–03.2–06 (1999), 40 PA. CONS. STAT. ANN. § 1301.602 (West 1999).

**5.** *See* ALA. CODE § 12–21–45(a) (1999), ARIZ. REV. STAT. ANN. § 12–565 (West 1999), CAL. CIV. CODE § 3333.1 (West 1997), DEL. CODE ANN. tit. 18, § 6862 (1998), GA. CODE ANN. § 51–12–1(b) (1999), IND. CODE ANN. § 34–44–1–2 (West 1999), MD. CODE ANN., CTS. & JUD. PROC. § 3–2A–06(f) (1998), MO. REV. STAT. § 490.715 (1996), OR. REV. STAT. § 18.580 (1998), R.I. GEN. LAWS § 9–19–34.1 (1998), S.D. CODIFIED LAWS § 21–3–12 (Michie 1999), WASH. REV. CODE ANN. § 7.70.080 (West 1992).

tion provides, "there shall be no reduction for collateral sources for which a subrogation or reimbursement right exists." FLA. STAT. ANN § 768.76(1) (West 1999).

In California, Pennsylvania, Rhode Island, and Maryland, subrogation and reimbursements rights are expressly eliminated when damages are reduced by the sum of benefits received from a collateral source payor. These states expressly prohibit a collateral source payor from seeking reimbursement from both the plaintiff and the defendant. For example, in Pennsylvania "The loss and damages awarded under this act shall be reduced by any public collateral source of compensation or benefits. A right of subrogation is not enforceable against any benefit or compensation awarded under this act or against any health care provider or its liability insurer." 40 PA. CONS. STAT. ANN. § 1301.602 (West 1999). In Rhode Island, "Whenever an award is so reduced, the lien of any first party payor who has paid such a benefit, against the judgment shall be foreclosed and the plaintiff shall have no legal obligation to reimburse said payor." R.I. GEN. LAWS § 9–19–34.1 (1998).[6]

In California, Cal. Civil Code § 3333.1(b) provides, "No source of collateral benefits introduced pursuant to subdivision (a) shall recover any amount against the plaintiff nor shall it be subrogated to the rights of the plaintiff against the defendant." In Maryland, CJP § 3–2A–06(f) provides, in part: "Except as expressly provided by federal law, no person may recover from the claimant or assert a claim of subrogation against a defendant for any sum included in a remittitur or awarded in a new trial . . ." Following Pennsylvania, Virginia, and California, the General Assembly elected to eliminate the plaintiff's obligation to reimburse a collateral source payor from a medical malpractice award.

---

**6.** Virginia has taken the most extreme position by prohibiting subrogation provisions in all contracts "providing hospital, medical, surgical and similar or related benefits . . ." *See* VA. CODE ANN. § 38.2–3405 (Michie 1999).

### Legislative History

As we have observed, the General Assembly enacted House Bill 1593 in 1987 in response to the so-called insurance crisis, and modified CJP §§ 3–2A–05(h) and 3–2A–06(f), to reduce medical malpractice awards and liability insurance premiums. The Senate Committee Report explains: "The Medical Mutual Liability Insurance Society of Maryland has committed to an 11% offset in its proposed premium rate increase on an occurrence basis this year, if the remittitur provision of House Bill 1593 is enacted in substantially its original form."

According to 1987 Md. Laws 596, the purpose of House Bill 1593 was to provide "for a modification or remittitur in awards for medical injury under certain circumstances ... prohibiting the exercise of certain subrogation rights in medical injury claims ..."

### Statutory Construction

█ We will now carefully examine the provisions of §§ 3–2A–05 and 3–2A–06, which apply only to claims of medical malpractice and only after an award of damages. CJP § 3–2A–06(f) permits a defendant who files a motion for remittitur or new trial to introduce evidence that the plaintiff "has been or will be paid, reimbursed, or indemnified to the extent and subject to the limits stated in § 3–2A–05(h) of this subtitle." CJP § 3–2A–05(h) permits a defendant to "request that damages be reduced to the extent that the claimant has been or will be paid, reimbursed, or indemnified under statute, insurance, or contract for all or part of damages assessed." In the event a new trial is ordered, § 3–2A–06(f) provides that such evidence is admissible and that the jury be instructed to consider such evidence. Thus, in a medical malpractice action, collateral source evidence is permitted in post-verdict proceedings, and it is within the discretion of the presiding judge or the jury to reduce the damages awarded accordingly.

█ Where a remittitur or new trial is granted, CJP § 3–2A–06(f) eliminates subrogation and reimbursement; "[e]xcept as expressly provided by federal law, **no person may recover**

**from the claimant or assert a claim of subrogation against a defendant** for any sum included in a remittitur or awarded in a new trial on damages granted under this subsection." (Emphasis added.) Hence, our interpretation of § 3–2A–06(f) will determine this appeal.

We believe the critical language of subsection (f) is, "for any sum included in a remittitur." In our view, this language is subject to more than one interpretation. BLACK'S LAW DICTIONARY 1298 (7th ed.1999) defines remittitur as "1. The process by which a court reduces or proposes to reduce the damages awarded in a jury verdict. 2. A court's order reducing an award of damages." In other words, the grant of a remittitur would deprive appellee of a portion of an award of damages. Thus, a remittitur actually involves two "sums." One, the sum awarded a claimant following remittitur, the other the sum remitted.[7]

Hence, in order to effectuate the intent of the legislature in enacting §§ 3–2A–05(h) and 3–2A–06(f), we must consider their legislative history. As we earlier noted, in enacting these provisions, the General Assembly was endeavoring to spread the expense of medical malpractice awards among several payors to reduce the cost of liability insurance. To achieve this result, the sum permitted must refer to the sum received by the claimant following the remittitur. As a result, a collateral source payor is prohibited from asserting a subrogation claim against the sum awarded the claimant, and from otherwise "recovering" any portion of the that award. This, we believe, is consistent not only with intent of the legislature, but with the language of §§ 3–2A–05(h) and 3–2A–06(f). If a new trial is granted, an award of damages is also protected from a collateral source payor, since § 3–2A–06(f) provides, "no person may recover from the claimant or assert a claim of subrogation against a defendant for any sum ... awarded in a new trial on damages ..." It was not the intent of the

---

7. The sum remitted should equal the sum received from the collateral source. In this case, Dr. Narayen sought remittitur of $399,539.00, the sum paid by BCBSM.

General Assembly to protect only the sum remitted or the amount of the reduction.

In a situation such as that now before us, had the trial court concluded that the award of damages was excessive, upon granting a remittitur or new trial, both BCBSM and the malpractice insurer would, as intended by the legislature, share damages awarded appellee.

That brings us to Dr. Narayen's second question. As Dr. Narayen sees it, CJP § 3–2A–06(f) eliminates a first party payor's right to seek reimbursement or indemnification of appellee's medical expenses. In appellee's view, however, the trial court was correct in concluding that reduction of claimant's damages would not preclude BCBSM from seeking reimbursement from appellee. We do not agree. We believe the trial court did not correctly interpret § 3–2A–06(f).

The trial court denied Dr. Narayen's Motion for Remittitur, or in the Alternative for New Trial, and did not reduce appellee's award of damages by the sum paid by BCBSM for appellee's medical expenses. In its memorandum opinion and order, the trial court said:

> The intent of Section 3–2A–06(f) is to prohibit a plaintiff from collecting damages when there will be a reimbursement otherwise for that same element of damages ...

> It is clear that Section 3–2A–06(f) is designed to prohibit [appellee] from collecting the $399,539.00 that was awarded by the jury for past medical expenses if Blue Cross and Blue Shield already paid those expenses. A plaintiff is not entitled to double enrichment. But, there is a question of whether the statute's language achieves its purpose. Specifically, the language of the statute is not definitive as to the intent with regard to the definition of indemnification.

> The issue before this court, then, is whether the indemnification language in Section 3–2A–06(f) is clear. Specifically, does indemnification permit a subsequent subrogation? And, does a subsequent right of subrogation by Blue Cross and Blue Shield come within the parameters of that statute

to afford a plaintiff such as [appellee] that protection that a party should receive.

... [Dr. Narayen's] argument fails to acknowledge the existence of a subrogation clause in [appellee's] insurance contract with Blue Cross and Blue Shield, and it fails to acknowledge that third party liability has been established.

Therefore, in light of the third party liability and subrogation clause in [appellee's] insurance policy, it would appear that Blue Cross and Blue Shield did not intend to indemnify, and did not indemnify [appellee] for payments made on her behalf. If the Maryland legislature had intended to eliminate subrogation rights of health insurers in all respects, it would have specifically done so. Instead, and not insignificantly, the statute provides that only after a reduction, no action can be maintained against a plaintiff for the amount reduced. It appears that the legislature, by not including language specifically abrogating subrogation rights, must have intended that the statute apply to collateral source benefits for which no subrogation right exists. It is only by this interpretation that the Maryland statute can fulfill its intended purpose of protecting against double recoveries by plaintiffs.

. . .

Because there is subrogation in the instant case, the payment of the stipulated medical bills in the amount of $399,539.00 by Blue Cross and Blue Shield of Maryland does not represent indemnification. Moreover, if this figure were reduced under the statute, [appellee] would only be indemnified to the extent of the amount reduced. [BCBSM] could not assert an action against [appellee] for the amount reduced; however, it could still assert a claim against her for the remaining balance—the portion not reduced because the statute does not protect her against that portion, therefore, because [BCBSM] has a right to collect from [appellee] the remaining balance, she was never indemnified at all because of the existence of [BCBSM's] subrogation lien.

Again, we do not agree. As we have said, we believe the trial court misconstrued § 3–2A–06(f)'s intent. As we have noted, CJP § 3–2A–06 was enacted not only to prevent double recovery by plaintiffs, but to address the medical malpractice insurance crisis. The General Assembly intended to combine an exception to the collateral source rule and eliminate subrogation rights in order to reduce the cost of medical malpractice insurance. Subrogation rights are thus eliminated only when a portion or all of a claimant's expenses have been paid by a collateral source. Such a double payment triggers the application of § 3–2A–06(f) to spread such expenses among all medical insurers.

The trial court mistakenly concluded that because appellee's insurance contract with BCBSM contained a subrogation clause, although BCBSM did not indemnify appellee, appellee continues to be personally liable to BCBSM for $399,539.00. The trial court is wrong. If appellee's award were reduced by $399,539.00, BCBSM's subrogation rights would be eliminated as were any other rights to "recover" this sum from appellee. The intent of BCBSM when it paid appellee's medical expenses is irrelevant. The purpose of § 3–2A–06(f) is to eliminate a third party payor's subrogation rights when an award has been reduced in accord with its provisions.

As we have pointed out, the language of § 3–2A–06(f) refers to the sum awarded a claimant following a remittitur or new trial. Accordingly, the trial court erred in concluding that "[appellee] would only be indemnified to the extent of the amount reduced." Under our interpretation of § 3–2A–06(f), if appellee's award is reduced by $399,539.00, BCBSM is not entitled to recover that sum from appellee. Appellee is entitled to the damages awarded her despite BCBSM having paid her medical expenses. Rather than having appellee remit $399,539.00 of her award to BCBSM, Dr. Narayen's insurer is responsible either for an award from a second jury, or for the sum due appellee after a remittitur.

According to the trial court, § 3–2A–06(f)'s language fails to achieve its purpose and thus did not apply to the situation

before it. We emphasize that the word indemnification does not trigger the application of § 3–2A–06(f). Instead, if either the trial court or a jury find damages to be excessive "on the ground that the claimant has been or will be paid, reimbursed, or indemnified . . .," § 3–2A–06(f) does not require that the claimant be paid, reimbursed **and** indemnified. Section 3–2A–06(f) was carefully crafted in order to protect appellee from having to remit a reduced award to the collateral source payor.[8] Because the trial court concluded that § 3–2A–06(f) does not abrogate subrogation, we shall vacate the judgment and remand the case to the Circuit Court for Baltimore City for further proceedings consistent with this opinion.

**JUDGMENT VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**

---

8. As noted, the trial court still has discretion to determine the threshold question of whether damages are excessive in the first place.