Filed 9/16/21  Ster v. Ster CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| JAMES FRANK STER III, | C087729 |
| Plaintiff and Respondent, | (Super. Ct. No. 34-2017-00215909-PR-TR-FRC) |
| v. | |
| JOHN STER, as Successor Trustee, etc., | |
| Defendant and Appellant; | |
| KAREN REEVES, | |
| Appellant. | |

Defendant John Ster ("John") and plaintiff James Frank Ster III ("James"), along with their adult siblings Judy Bauer ("Judy") and Janice Glaser ("Janice"), are beneficiaries of their deceased father's trust, the James Frank Ster, Jr. Revocable Living Trust (the "Trust").  On appeal, John and his wife Karen Reeves ("Karen") contend the trial court erred in removing John as the acting trustee, freezing the assets of the Trust,

1

and compelling the sale of a piece of real property that had been transferred to them from the Trust. John and Karen ask us to vacate the trial court's orders and remand the matter for trial.

Karen acknowledges that she is not a beneficiary of the Trust but argues she has standing as an aggrieved co-owner of the property ordered to be sold. She contends the trial court's orders are void because she never received notice of the hearing or related petitions. John additionally contends the trial court erred in failing to hold an evidentiary hearing. James contests Karen's standing and argues, among other things, that the challenged order freezing the trust assets was not appealable as it was tantamount to a preliminary injunction.

We will reverse the trial court's orders and remand the matter for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

James Frank Ster, Jr., was the settlor (the "settlor") of the Trust. He died in November 2016, and the Trust became irrevocable. The Trust included the settlor's personal property (of an undetermined value), a certificate of deposit worth approximately $50,000 (CD), and three residential properties, referred to by the parties as the "Poplar," "Sandburg," and "Cobalt" properties.

A.    *Relevant term of the Trust*

Under the terms of the Trust, each of the beneficiaries was to receive an equal pro rata share of the entire trust estate. The Trust specifies that John was to receive a special gift of the Cobalt property, subject to any liens and encumbrances. The fair market value of the Cobalt property was fixed at $300,000, regardless of when the settlor died, so that "no appraisal shall be necessary." The Trust contemplated that John would likely be required to provide an equalizing payment to the other beneficiaries in order to achieve the result that each beneficiary receives an equal share of the entire estate. The Trust also

2

contemplated that John may need to obtain a loan to ensure that the estate had enough liquid assets so that each beneficiary receives an equal share.

The Trust grants the trustee the discretion to "defer actual division or distribution for such reasonable period of time as is needed to effectively identify, take possession of, value, divide, and distribute the assets of the trust."

The Trust granted additional powers to the trustee, including the power to "[m]anage, control, improve, and maintain all real and personal trust property," including the authority, "[w]ith or without court authorization, [to] sell [ ], convey, exchange, partition, and divide trust property."

In addition, the trustee has the power to (1) "[m]ake ordinary or extraordinary repairs or alterations in buildings or other trust property," (2) "[e]mploy and discharge agents and employees," and (3) "[b]orrow money for any trust purpose" or "encumber any trust property." The trustee is also granted the power to self-deal in defined circumstances. The trustee was required to render an account only at the termination of the Trust, on change of the trustee, or as required by law. The trustee is not liable for acts or omissions, except those resulting from the trustee's "willful misconduct or gross negligence." The trustee has the power to make discretionary distributions to a beneficiary, including for "health, education, maintenance, and support," "based on the beneficiary's standard of living at the date of distribution." Under such circumstances, no equalizing distribution is required, and these distributions are final and incontestable.

John was designated as successor trustee, with Janice designated as the alternate. If neither John nor Janice were able or willing to serve, a new trustee would be appointed by majority vote of the remaining adult beneficiaries.

B.     *First petition by James*

In July 2017, James petitioned to compel the trustee to make distributions. James stated he had been negotiating with John since November 2016 regarding his share of the Trust and hoped to receive one of the residential properties. James alleged John had been

3

living in the Cobalt property without paying rent or transferring title to himself, and he had used trust funds to repair the property. James further alleged John had taken no steps to liquidate the residential properties, and had failed to make any distributions. James requested the court order the trustee to distribute the Poplar property to James, with an assigned distribution value of $174,500.

John responded that he offered to transfer to James as his full and final distribution the Poplar house, along with certain other personal property and forgiveness of a $7,000 loan. James rejected the offer. James also rejected John's subsequent attempt to distribute James's share in March 2017, based on disagreements about how the $50,000 CD funds should be distributed. In the meantime, John distributed the trust personal property to the beneficiaries, with James receiving a car, a mobility scooter, and miscellaneous household items.

John stated that he met with James, Janice, and Judy in May 2017, and James said he wanted to purchase the Poplar property. Judy said she wanted to acquire the Sandburg property, and all four agreed that John could initiate the transfer of the Cobalt property to himself. James had previously asked that Cobalt not be transferred until all other assets had been distributed, but he agreed to talk with his counsel about withdrawing his objection.

In June 2017, John again offered to transfer the Poplar property and other property to James as his full and final distribution. James sent a letter saying he accepted the offer, but he actually only accepted the offer's $174,500.00 valuation of the property. James also demanded an accounting. In his petition to compel distributions, James argued he refused to agree to the offers to settle because he did not want to waive his right to an accounting and full distribution.

John stated he and James continued to negotiate the terms of James's distribution in September and October 2017. In October 2017, John obtained new counsel.

4

C.    *Second petition by James*

In September 2017, James petitioned the court to remove John as trustee and appoint Janice as successor trustee, and for John to provide an accounting. James alleged John continued to disregard his fiduciary duties, including using trust funds to maintain and improve the residence that would eventually be transferred to him (i.e., Cobalt). James further alleged John still had not taken any steps to distribute the other real properties, and had failed to provide an accounting. James again demanded an accounting and attorney fees.

In his reply, John stated that he had lived in Kansas the entire time he served as trustee of the Trust. He stayed in the Cobalt property for short periods when he traveled to California to administer the Trust. John had spent trust funds to make necessary repairs to the Cobalt property, including repairing a backyard fence that had fallen down, hiring an arborist to trim a large tree that was in danger of falling down, and addressing a rodent infestation. John also used trust funds to pay monthly utilities for the Cobalt property, including Internet. John was aware that James had objected to transferring the Cobalt property to John, but he made the repairs to avoid waste of a trust asset.

John stated he also had spent funds to make necessary repairs to the Poplar and Sandburg properties. At the Poplar property, the carpet had been replaced, the inside repainted, and the outside grounds cleaned up. John was in the process of looking for a new tenant for the Poplar property and planned to increase the rent. John had not placed the Poplar property on the market for sale because James had expressed interest in acquiring the property. John also had not placed the Sandburg property on the market because Judy had expressed interest in acquiring it.

In October 2017, John completed the transfer of the Cobalt property to himself and Karen as community property. He and Karen obtained a $225,000 loan against the property, and the entire proceeds were deposited in the Trust bank account. John stated he intended to use the funds to make equalizing distributions as contemplated in the

5

Trust, with any excess to be a loan to the Trust. In addition, the funds would pay for the litigation.

John stated that he had provided "informal accounting information" in January and February 2017. At that time, he was preparing a formal accounting and hoped to have it completed by the next hearing in December 2017.

D.  *December 2017 hearing; James's third petition; court freezes trust accounts*

During the December 2017 hearing, the court continued the matter to March 2018 so John could file and serve a formal accounting by January 12, 2018. John's counsel informed the court the accounting would be ready by then. The accounting was delayed, but ultimately was filed on January 30, 2018.

On January 24, 2018, James filed an ex parte petition for an injunctive order to prevent any further dissipation of trust assets and to freeze all assets until further court order. James also requested the court issue an order preventing John from transferring, further mortgaging, or in any manner further hypothecating the Cobalt property, either in his individual capacity or as trustee.

In this petition, James alleged John had transferred trust property to himself, spending more than $80,000 in trust cash since November 2016 with no benefit to the beneficiaries. In addition, he asserted that John had taken a $225,000 loan against the property he transferred to himself, allegedly because the funds were needed for trust administration. James argued this was improper because the Trust had a $50,000 CD in November 2016 and had received rental income from the three real properties in the meantime. In addition, John had failed to file the accounting by the January 12 deadline.

James also alleged that John had distributed $500 to Judy and transferred the Cobalt property to himself without making the required equalizing payments to the other beneficiaries. James calculated the total assets of the Trust originally were worth approximately $779,000 ($300,000 for the Cobalt property, $55,000 in cash, $179,000

6

for the Poplar property, and $245,000 for the Sandburg property). James also calculated the Trust should have received $25,000 to $30,000 in rental income, for a total value of $809,000. James argued that had that sum been distributed, each beneficiary would have been entitled to a $200,000 distribution, but now the available assets would leave each beneficiary with a $140,000 distribution. James's petition included a copy of the grant deed transferring the Cobalt property to John and Karen as joint owners. The ex parte petition, however, did not reflect service of process on Karen.

John objected, arguing that as trustee he had properly spent trust money. John also noted that he had traveled to California on nine different trips, for a total of 105 days, to address trust business and, rather than spend funds on a hotel, he stayed at the Cobalt property and used trust funds to maintain the property.

On January 24, 2018, the court issued an order freezing the trust bank accounts and enjoining John from transferring, further mortgaging or hypothecating the Cobalt property, either in his individual capacity or as trustee. The order would remain in effect until the next hearing on March 1, 2018. During the hearing, John disclosed that he had made a $75,000 distribution to Janice because she was ill.

E.    *John files first account and report, and petitions to surcharge James's*
      *interest in the Trust*

On January 30, 2018, John filed the formal accounting in a 96-page report with 741 pages of supporting confidential financial records. He also petitioned for trustee compensation, arguing he had administered the Trust according to its terms, and attorney compensation. John requested the court to find all the facts stated in the account and report to be true, and asked the court to approve all the acts in the trustee's report.

On February 20, 2018, John filed a petition to surcharge James's interest in the Trust for the attorney fees and costs incurred in defending against James's actions against the trustee, arguing they were filed in bad faith. John argued James's conduct had impeded the process of distributing the trust assets and winding down its affairs. John

7

noted that his counsel had attempted to depose James in February 2018, but James failed to answer all the questions and produce all documents.

F.    *James files amended petition to remove the trustee and objects to the accounting, and John challenges the court's freezing order*

On February 22, 2018, James filed an amended petition to remove the trustee, asking that a private fiduciary be appointed instead of Janice, who he said harbored actual bias against him. James argued John had filed the accounting late, and it was inaccurate. According to James, the accounting failed to include at least one check for $326 issued to a health care provider (presumably for John). James further argued John had made preferential distributions to himself (the Cobalt property) and Janice ($75,000), and he had paid his current counsel $100,000.

On March 1, 2018, the court continued the matter to April and extended the order freezing the trust bank accounts and enjoining John from transferring, mortgaging, or further hypothecating the Cobalt property. On March 16, John filed an ex parte application requesting the court reconsider its order freezing the bank accounts. John argued the order would make it difficult to pay taxes, which were due in April. On March 23, the trial court granted the request and set a hearing for April 6. During the April 6 hearing, the court ordered $10,000 of unallocated funds to be released to John.

On April 18, 2018, James filed an objection to the accounting. James argued the attorney fees were unnecessary and "astronomical," and the travel expenses were excessive. He also alleged the funds remaining in his father's accounts were not included in the trust accounting. In addition, there had been impermissible comingling between John's personal credit card and the trust accounts. Finally, he alleged there had been self-dealing regarding the Cobalt property, and the accounting did not comply with local rules. James asked the court to deny the requested relief and order John to submit a complete accounting. James also asked that the matter be set for trial.

Later that month, the court continued the hearings on the petition for reconsideration of the freezing order, the petition to compel the trustee to make distributions, and the motion to approve the accounting, so that they could be heard in May 2018, together with the petition for surcharge and the amended petition to remove the trustee. During the hearing, the trial court indicated it did not want to see additional briefs or pleadings from the parties.

On May 10, 2018, John filed an objection to James's amended petition to remove him as trustee. He had not done so previously. John reiterated that the check for $326 was reflected in the accounting, and he argued that James's amended petition for removal contained inaccuracies. John stated that given the court's instructions against additional pleadings, he would forego a lengthy written response and instead address specific allegations at the time of trial.

G.      *The May 17, 2018 hearing*

During the May 17, 2018 hearing, the trial court considered the following petitions:  (1) James's amended petition to remove the trustee and appoint a private fiduciary; (2) James's petition for injunctive relief to freeze all trust assets; (3) James's petition to compel distribution; (4) John's petition to surcharge James's interest in the Trust; and (5) John's first account and report of the trustee and petition to allow attorney compensation. James's proof of service for the hearing does not reflect service on Karen.

During the hearing, James advised the court he wished to drop his petition to compel distribution, and the court did so. The court also was advised that Judy and Janice had traveled great distances to be present to give testimony, with Judy coming from Colorado and Janice coming from the United Arab Emirates.

The court first considered James's amended petition to remove John as trustee. James's counsel argued John should be removed as trustee because he was dissipating Trust assets by having made a preferential distribution to Janice and by having paid significant amounts of attorney fees to defend his alleged breaches of trust. John's

9

counsel responded that John should not be removed as trustee because James was the one whose filings had necessitated the litigation expenses. James had filed four petitions, each of which required a detailed response. James had also rejected the offer of an informal accounting and instead demanded a formal accounting, even though it was not required by the Trust until the end of the trust administration. James had also refused to produce all documents at his deposition and had behaved disruptively. John noted that the Trust allowed the trustee to hire legal counsel.

The court asked why it should not simply order all three of the Trust's properties to be sold. John's counsel responded that the Cobalt property had been specifically gifted to John. John informed the court that he was looking to purchase real property in Kansas, but he could not because of the existing mortgage on the Cobalt property.

After additional argument, the court granted James's petition to remove John as trustee and appointed a private fiduciary. The court also granted James's petition for injunctive relief to freeze the Trust assets, while allowing $20,000 to be released to John. The court scheduled a separate hearing for John's petition to surcharge James's interest in the Trust, and a separate trial for John's first account and report of trustee and petition to allow compensation to attorneys. In addition, the court ordered the Cobalt home be listed for sale within 30 days and funds from the sale to be placed into the blocked trust account until the conclusion of the trial. John was to list the property and finalize the sale, with the proceeds made payable to the new trustee.

A written order memorializing the court's verbal orders was filed on June 5, 2018 (the June 5 order). The June 5 order does not contain any findings.

H.     *Karen and John seek to have order set aside*

On July 31, 2018, Karen filed a notice of intention to file a motion to set aside and vacate the June 5 order pursuant to Code of Civil Procedure section 663. Karen argued she had standing because she was aggrieved by the order, given that she had an ownership interest in the Cobalt property. According to Karen, the decision was not

10

consistent with or supported by the facts.  Karen also argued she was never served with notice of the May 2018 hearing or related petitions.  As such, she argued, the court erred in (presumably) finding that notice had properly been given.  A hearing was set for October 25, 2018.  On the date set for hearing, however, the court "dropped" the motion from the calendar for reasons that are not stated in the minute order, but likely because the court lost jurisdiction to hear the matter since it was more than 60 days after the June 5 order was filed.  (Code Civ. Proc., former § 663a, subd. (b).)

John and Karen both timely appealed from the June 5 written order and the order orally issued on May 17, 2018.

DISCUSSION

I

We turn first to the issue of whether Karen has standing to appeal.  James argues Karen lacks standing because she was not a party of record in the trial court.  According to James, although Karen may have tried to become a party for purposes of appeal by filing a motion to set aside or vacate the June 5 order, her efforts did not confer standing to appeal because she failed to appeal from the trial court's order dropping her motion to vacate.  We find James's contentions without merit.

The right to appeal is statutory, and only a party who has standing to appeal may do so.  (*Conservatorship of Gregory D.* (2013) 214 Cal.App.4th 62, 67.)  This is a jurisdictional rule and cannot be waived.  (*Ibid.*)  Under Code of Civil Procedure section 902, "[a]ny party aggrieved" may appeal from an adverse judgment.  A party is sufficiently aggrieved to qualify for appellate standing when his or her rights or interests are injuriously affected by the judgment or order, and those rights or interests " ' "must be immediate, pecuniary, and substantial and not nominal or a remote consequence of the judgment." ' " (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 737.)

Ordinarily, an appeal cannot be taken unless the appellant is a party of record at the time of the challenged judgment or order, or has attempted to become so for purposes

11

of appeal by filing a motion to vacate the adverse ruling and then appealing from the trial court's ruling on that motion. (*Butterfield v. Belho Corp.* (1966) 247 Cal.App.2d 483, 484-485 (*Butterfield*).) As courts have explained, "[t]he primary reason for requiring this procedural step is to prevent persons not truly aggrieved, and whose interest in the particular litigation is not clearly established, from processing an appeal." (*Id.* at p. 485.)

However, "if an appellant would be bound by a ruling of the trial court because of the doctrine of res judicata, irrespective of the fact it was not a party of record in the original proceeding, then it is a party sufficiently aggrieved to warrant the right of direct appeal." (*Butterfield, supra*, 247 Cal.App.2d at p. 485, citing *Estate of Sloan* (1963) 222 Cal.App.2d 283, 292.)

In *Butterfield*, the plaintiff obtained a monetary judgment against a group of defendants. (*Butterfield, supra*, 247 Cal.App.2d at p. 484.) Before issuance of a writ of execution, the defendants transferred a parcel of real property to the appellant Belho Corporation. (*Ibid.*) That property was then sold to Butterfield at an execution sale. (*Ibid.*) Soon thereafter, the trial court granted Butterfield's motion to set aside the sale because of a misunderstanding about the purchase price. (*Ibid.*) The defendants did not appeal the decision, but Belho did. (*Ibid.*) The appellate court concluded Belho had standing to bring the appeal, even though it was not a party of record to the original action resulting in the judgment, and it failed to file a motion to vacate the ruling. (*Id.* at pp. 484-486.) The court reasoned Belho had acquired title to the property after Butterfield had secured its judgment against the defendants. Belho had standing because its interest in the property "is immediate and any action taken against the property directly affects the status of Belho's title, and would be binding upon it." (*Id.* at p. 485.)

Similarly here, Karen acquired an interest in the Cobalt property when it was transferred to her and John in October 2017. Any action against the Cobalt property, including an order requiring John to sell it, directly affects the status of her title and would be binding upon her. Just as in *Butterfield*, even though Karen failed to appeal

12

from the trial court's decision to drop her motion to vacate the order, Karen is an aggrieved party and has standing to bring her appeal. (See also *Marsh v. Mountain Zephyr, Inc.* (1996) 43 Cal.App.4th 289, 295-296 [nonparty had standing to appeal where order was binding on him and its injurious effect was immediate, pecuniary, and substantial].)

## II

We turn next to whether the May 17 and June 5 orders are appealable. "It is well established that '[a]ppeals which may be taken from orders in probate proceedings are set forth in . . . the Probate Code, and its provisions are exclusive.' [Citation.]" (*Estate of Stoddart* (2004) 115 Cal.App.4th 1118, 1125-1126; see also *Kalenian v. Insen* (2014) 225 Cal.App.4th 569, 575.) " 'There is no right to appeal from any orders in probate except those specified in the Probate Code.' [Citation.]" (*Estate of Stoddart, supra*, at p. 1126.)

In an apparent attempt to argue that the issues decided in the challenged orders are severable (a proposition for which no authority is cited), James concedes that the portion of the order removing John as trustee is appealable (Prob. Code, § 1300, subd. (g) [appeal may be taken from order removing a fiduciary]), but argues that no appeal may be taken from the portion of the order granting the freeze of the trust accounts because it does not fall within the scope of Probate Code sections 1300 or 1304. James also contends the orders are not appealable because his petition to freeze the accounts sought injunctive relief under Code of Civil Procedure sections 526 and 527.

Given that the orders, inter alia, (1) denied John's request to be able to transfer and encumber the Cobalt property, and (2) required John to sell the Cobalt property and place the proceeds in a blocked trust account, we conclude they are appealable. (Prob. Code, § 1300, subd. (a) [appeal may be taken from order directing the sale of property, or from a court's refusal to make an order authorizing the encumbrance of property].)

Karen argues the trial court erred and violated her due process rights in enjoining John from further mortgaging or hypothecating the Cobalt property, and in ordering John to sell the Cobalt property, despite James's failure to provide her with notice of the related petitions and hearings as required under Probate Code section 17203 and Code of Civil Procedure section 527, including his ex parte petition to freeze all trust assets and enjoin John from transferring or further hypothecating the Cobalt property. According to Karen, James was required to give her notice of the petitions and hearings because his proposed remedies would affect her rights and interest as co-owner of the Cobalt property.

Although James contests Karen's right to appeal, he makes no argument in his briefs regarding her right to receive notice of the hearing and related petitions at issue here. We agree with Karen that she was entitled to notice and never received it. Where notice is required to be given and is not given, the resultant order is void and may be collaterally attacked by anyone at any time. (*Texas Co. v. Bank of America etc. Assn.* (1935) 5 Cal.2d 35, 41.)

Although the record is silent on the issue, the trial court must have found notice to be sufficient, since it proceeded to hold the May 17 hearing and issue orders. This was error because the record affirmatively shows that James never gave notice to Karen. (See *People v. Giordano* (2007) 42 Cal.4th 644, 666 [we presume on appeal that an order of the trial court is correct, make all inferences in support of it where the record is silent, and require that any error must be affirmatively shown].) James was aware when he filed his freeze petition that Karen and John were joint owners of the Cobalt property, because one of his exhibits to his petition is a copy of the grant deed transferring the Cobalt property to John and Karen as community property. However, Karen was not served with notice of the May 17 hearing or the related filings. Karen also subsequently filed a declaration stating she had never been served with legal papers in the matter.

James brought his petition to freeze the trust assets and enjoin John from transferring or further hypothecating or mortgaging the Cobalt property, requiring him to provide notice to the opposing party. (Code Civ. Proc., § 527, subd. (a).) James's petition also alleged breaches of the trust and requested remedies that dealt with internal trust affairs, including John's powers as trustee to manage the trust assets and the Cobalt property, meeting all the requirements of a petition under Probate Code section 17200. (See Prob. Code, § 17200, subd. (b)(6) & (12) [proceedings concerning the internal affairs of a trust include, but are not limited to, proceedings that "instruct[ ] the trustee," and "compel[ ] redress of a breach of the trust by any available remedy"].) Because James's petition was the functional equivalent of a petition brought under Probate Code section 17200, he was required to provide notice of the hearing on the petition to "any person, other than a trustee or beneficiary, whose right, title, or interest would be affected by the petition" and who had not already received notice. (Prob. Code, § 17203, subd. (b).) Karen was entitled to such notice since James's proposed remedies would affect her interest in the Cobalt property.

In addition to this statutory right to notice, the Fourteenth Amendment of the United States Constitution provides that a state may not "deprive any person of life, liberty, or property, without due process of law." "The concept of property in California is extremely broad," and is often considered to " 'refer to a "bundle of rights" that may be exercised with respect to that object.' " (*Estate of Sigourney* (2001) 93 Cal.App.4th 593, 603.) In asking the court to enjoin John from transferring or further hypothecating or mortgaging the Cobalt property, in effect James was also asking the court to limit Karen's rights to do so as well, given that John and Karen held title as community property. As such, she was entitled to notice of the hearing and James's related petitions, especially since the trial court ordered the sale of the Cobalt property.

The lack of notice deprived Karen of the opportunity to advocate against a forced sale of the Cobalt property (including arguing that the sale was not necessary to preserve

15

the trust estate), and in favor of permitting John to transfer, mortgage, or further hypothecate the Cobalt property. The appropriate remedy is to reverse the trial court's orders, especially since the record does not make clear whether the court ordered the sale of the Cobalt property based on James's petition to freeze the trust assets or his petition to remove John as trustee, or on some other basis. (See *Estate of Sigourney, supra*, 93 Cal.App.4th at pp. 598-599, 605-606 [reversing the trial court's order to modify a charitable trust regarding the appointment of a successor cotrustee because the appellants (some of whom were potential successor cotrustees and all of whom questioned the proposed changes) had not been provided notice of the proceedings].)

Given our conclusions, we need not reach John's contentions that his due process rights were violated by the trial court's forced sale of the Cobalt property, and that the trial court erred by not holding an evidentiary hearing.

### DISPOSITION

The orders issued in May and June 2018 are reversed. The trial court is directed to entertain James's freeze petition and petition to remove John as trustee, upon proper notice. If James fails to notice a hearing on his petition(s) within 30 days of the remittitur, the trial court is instructed to enter an order denying the petition(s). John and Karen are awarded costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

                                                   KRAUSE , J.

We concur:

RAYE , P. J.

RENNER , J.

16